# FAIR ASSESSMENT IN REAL ESTATE ASSOCIA-TION, INC., ET AL. *v.* McNARY ET AL.

No. 80–427.   Argued October 5, 1981—Decided December 1, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, STEVENS, and O'CONNOR, JJ., joined, *post,* p. 117.

*David J. Newburger* argued the cause for petitioners. With him on the briefs were *Susan Spiegel, Steve Vossmeyer,* and *James P. Gamble.*

*Thomas W. Wehrle* argued the cause for respondents. With him on the brief for respondents McNary et al. was *Andrew J. Minardi. John Ashcroft* and *Michael L. Boicourt* filed a brief for respondents Williams et al.*

JUSTICE REHNQUIST delivered the opinion of the Court.

In this action we are required to reconcile two somewhat intermittent and conflicting lines of authority as to whether a damages action may be brought under 42 U. S. C. § 1983 to redress the allegedly unconstitutional administration of a state tax system. The United States District Court for the Eastern District of Missouri held that such suits were barred by both 28 U. S. C. § 1341 (Tax Injunction Act) and the prin-

---

*\*John J. Enright, William J. Costello, Eugene L. Griffin,* and *Michael F. Baccash* filed a brief for the International Association of Assessing Officers as *amicus curiae.*

ciple of comity, and the Court of Appeals for the Eighth Circuit affirmed by an equally divided court sitting en banc.[1] We granted certiorari to resolve a conflict among the Courts of Appeals,[2] 450 U. S. 1039, and we now affirm. Before setting forth the facts, we think that a description of the past and at times divergent decisions of this Court may shed light upon the proper disposition of this case.

I

This Court, even before the enactment of § 1983, recognized the important and sensitive nature of state tax systems and the need for federal-court restraint when deciding cases that affect such systems. As Justice Field wrote for the Court shortly before the enactment of § 1983:

"It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public." *Dows* v. *Chicago*, 11 Wall. 108, 110 (1871).

After this Court conclusively decided that federal courts *may* enjoin state officers from enforcing an unconstitutional state law, *Ex parte Young*, 209 U. S. 123 (1908), Congress also recognized that the autonomy and fiscal stability of the

---

[1] *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 478 F. Supp. 1231 (1979), aff'd, 622 F. 2d 415 (1980).

[2] Compare *Fulton Market Storage Co.* v. *Cullerton*, 582 F. 2d 1071 (CA7 1978), cert. denied, 439 U. S. 1121 (1979), with *Fair Assessment in Real Estate Assn., Inc.* v. *McNary, supra; Ludwin* v. *City of Cambridge*, 592 F. 2d 606 (CA1 1979); and *Bland* v. *McHann*, 463 F. 2d 21 (CA5 1972), cert. denied, 410 U. S. 966 (1973).

States survive best when state tax systems are not subject to scrutiny in federal courts. Thus, in 1937 Congress provided:

> "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341 (hereinafter § 1341 or Act).

This legislation, and the decisions of this Court which preceded it, reflect the fundamental principle of comity between federal courts and state governments that is essential to "Our Federalism," particularly in the area of state taxation. See, e. g., *Matthews* v. *Rodgers*, 284 U. S. 521 (1932); *Singer Sewing Machine Co.* v. *Benedict*, 229 U. S. 481 (1913); *Boise Artesian Water Co.* v. *Boise City*, 213 U. S. 276 (1909). Even after enactment of § 1341 it was upon this comity that we relied in holding that federal courts, in exercising the discretion that attends requests for equitable relief, may not even render declaratory judgments as to the constitutionality of state tax laws. *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293 (1943).

Contrasted with this statute and line of cases are our holdings with respect to 42 U. S. C. § 1983. In 1871, shortly after Justice Field wrote of the vital and vulnerable nature of state tax systems, Congress enacted § 1983 with its familiar language:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Obviously § 1983 cut a broad swath. By its terms it gave a federal cause of action to prisoners, taxpayers, or anyone else

who was able to prove that his constitutional or federal rights had been denied by any State. In addition, the statute made no mention of any requirement that state remedies be exhausted before resort to the federal courts could be had under 28 U. S. C. § 1343.[3] The combined effect of this newly created federal cause of action and the absence of an express exhaustion requirement was not immediately realized. It was not until our decision in *Monroe* v. *Pape*, 365 U. S. 167 (1961), that § 1983 was held to authorize immediate resort to a federal court whenever state actions allegedly infringed constitutional rights:

> "Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U. S., at 183.

The immediacy of federal relief under § 1983 was reemphasized in *McNeese* v. *Board of Education*, 373 U. S. 668 (1963), where the Court stated: "It is immaterial whether [the state official's] conduct is legal or illegal as a matter of state law. Such claims are entitled to be adjudicated in the federal courts." *Id.*, at 674 (citation and footnote omitted). And in the unargued *per curiam* opinion of *Wilwording* v.

---

[3] We held in *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600 (1979), that 28 U. S. C. § 1343, the jurisdictional counterpart of 42 U. S. C. § 1983, was narrower in scope than the latter. Because there can be no doubt that a claim of denial of due process or equal protection under the Fourteenth Amendment, which these petitioners asserted, would come under the narrower construction of § 1343 adopted by the Court in *Chapman, supra*, it is unnecessary to pursue here the difference between § 1983 and § 1343.

*Swenson,* 404 U. S. 249 (1971), the Court concluded that "[p]etitioners were . . . entitled to have their actions treated as claims for relief under the Civil Rights Acts, not subject . . . to exhaustion requirements." *Id.,* at 251. See also *Damico* v. *California,* 389 U. S. 416 (1967); *Houghton* v. *Shafer,* 392 U. S. 639, 640 (1968); *Steffel* v. *Thompson,* 415 U. S. 452, 472–473 (1974).

Thus, we have two divergent lines of authority respecting access to federal courts for adjudication of the constitutionality of state laws. Both cannot govern this case. On one hand, § 1341, with its antecedent basis in the comity principle of *Matthews* v. *Rodgers, supra,* and *Boise Artesian Water Co.* v. *Boise City, supra,* bars at least federal injunctive challenges to state tax laws. Added to this authority is our decision in *Great Lakes Dredge & Dock Co.* v. *Huffman, supra,* holding that declaratory judgments are barred on the basis of comity. On the other hand is the doctrine originating in *Monroe* v. *Pape, supra,* that comity does not apply where § 1983 is involved, and that a litigant challenging the constitutionality of any state action may proceed directly to federal court. With this divergence of views in mind, we turn now to the facts of this case, a § 1983 challenge to the administration of state tax laws which implicates both lines of authority. We hold that at least as to such actions, which is all we need decide here, the principle of comity controls.

## II

Petitioner Fair Assessment in Real Estate Association is a nonprofit corporation formed by taxpayers in St. Louis County (County) to promote equitable enforcement of property tax laws in Missouri. Petitioners J. David and Lynn F. Cassilly own real property with recent improvements in the County. Petitioners filed suit under § 1983 alleging that respondents, the County's Tax Assessors, Supervisors, and Director of Revenue, and three members of the Missouri State

Tax Commission, had deprived them of equal protection and due process of law by unequal taxation of real property.

The complaint focuses on two specific practices by respondents. First, petitioners allege that County properties with new improvements are assessed at approximately 33⅓% of their current market value, while properties without new improvements are assessed at approximately 22% of their current market value. This disparity allegedly results from respondents' failure to reassess old property on a regular basis, the last general reassessment having occurred in 1960. Second, petitioners allege that property owners who successfully appeal their property assessments, as did the Cassillys in 1977, are specifically targeted for reassessment the next year.

Petitioners have previously sought some relief from respondents' assessments in state proceedings. In 1975, petitioner David Cassilly and others brought an action in which the State Circuit Court ordered respondent Antonio to reassess all real property in the County. On direct appeal, however, the Missouri Supreme Court reversed on the ground that the State Tax Commission, not the Circuit Court, should supervise the reassessment process. *State ex rel. Cassilly* v. *Riney*, 576 S. W. 2d 325 (1979) (en banc). In 1977, the Cassillys appealed the tax assessed on their home to the County Board of Equalization and received a reduction in assessed value from 33⅓% to 29%. When their home was again assessed at 33⅓% in 1978, the Cassillys once more appealed to the Board of Equalization. That appeal was pending at the commencement of this litigation.

The Cassillys brought this § 1983 action in federal court seeking actual damages in the amount of overassessments from 1975 to 1979, and punitive damages of $75,000 from each respondent. Petitioner Fair Assessment sought actual damages in the amount of expenses incurred in efforts to obtain equitable property assessments for its members. As in all other § 1983 actions, the award of such damages would first

require a federal-court declaration that respondents, in administering the state tax, violated petitioners' constitutional rights.

## III

As indicated by our discussion in Part I, § 1341 and our comity cases have thus far barred federal courts from granting injunctive and declaratory relief in state tax cases. Because we decide today that the principle of comity bars federal courts from granting damages relief in such cases, we do not decide whether that Act, standing alone, would require such a result.[4] The correctness of the result in this case is demonstrated by an examination of the pre-Act decisions of this Court, the legislative history of the Act, our post-Act decision in the *Great Lakes* case, and more recent recognition of the principles of federalism.

## A

Prior to enactment of § 1341, virtually all federal cases challenging state taxation sought equitable relief.[5] Conse-

---

[4] The result we reach today was foreshadowed by our decision last Term in *Rosewell* v. *LaSalle National Bank*, 450 U. S. 503 (1981), wherein we stated that "even where the Tax Injunction Act would not bar federal-court interference in state tax administration, principles of federal equity may nevertheless counsel the withholding of relief. See *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293, 301 (1943)." *Id.*, at 525–526, n. 33. We need not decide in this case whether the comity spoken of would also bar a claim under § 1983 which requires no scrutiny whatever of state tax assessment practices, such as a facial attack on tax laws colorably claimed to be discriminatory as to race.

[5] Of course, the Court had not yet broadly interpreted the Civil Rights Act to permit federal damages actions for state violations of constitutional rights, brought prior to exhaustion of state remedies. See *Monroe* v. *Pape*, 365 U. S. 167 (1961). The closest pre-Act case to a federal damages action was a suit for refund of state taxes allegedly assessed in violation of the Fourteenth Amendment. *First National Bank* v. *Board of County Commissioners*, 264 U. S. 450 (1924). Consistent with the federal-court deference for state tax matters of which we speak today, the Court held

quently, federal-court restraint in state tax matters was based upon the traditional doctrine that courts of equity will stay their hand when remedies at law are plain, adequate, and complete. See, *e. g., Matthews* v. *Rodgers*, 284 U. S. 521 (1932); *Singer Sewing Machine Co.* v. *Benedict*, 229 U. S. 481 (1913); *Boise Artesian Water Co.* v. *Boise City*, 213 U. S. 276 (1909). Even with this basis in equity law, these cases recognized that the doctrine of equitable restraint was of "notable application," *Boise Artesian Water Co., supra,* at 281, and carried "peculiar force," *Matthews, supra,* at 525, in suits challenging the constitutionality of state tax laws. Such restraint was particularly appropriate because of the delicate balance between the federal authority and state governments, and the concomitant respect that should be accorded state tax laws in federal court. As the Court in *Matthews* explained:

> "The reason for this guiding principle [of equitable restraint] is of peculiar force in cases where the suit, like the present one, is brought to enjoin the collection of a state tax in courts of a different, though paramount sovereignty. The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it." 284 U. S., at 525. [6]

that the action was barred by the parties' failure to exhaust their available state remedies. *Id.,* at 456. Although declaratory actions were available before 1937, they were seldom used. See Note, Federal Declaratory Judgments on the Validity of State Taxes, 50 Yale L. J. 927, 929–930, and n. 14 (1941).

[6] JUSTICE BRENNAN has cogently explained the reasons behind federal-court deference for state tax administration:

"The special reasons justifying the policy of federal noninterference with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpay-

Thus, in 1909 we could state that "[a]n examination of the decisions of this court shows that a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused it to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired." *Boise Artesian Water Co., supra,* at 282.

## B

This policy of equitable restraint based on notions of comity did not completely clear the federal courts of state tax cases. Indeed, the Senate Report on the bill that was to become § 1341 referred to "[t]he existing practice of the Federal courts in entertaining tax-injunction suits against State officers . . . ." S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937). An examination of the cases of that era demonstrates, however, that this practice resulted not from a repudiation of the principle of comity, but from federal-court determinations that available state remedies did not adequately protect the federal rights asserted. See, *e. g.,* *Grosjean* v. *American Press Co.,* 297 U. S. 233, 242 (1936); *Gully* v. *Interstate Natural Gas Co.,* 82 F. 2d 145 (CA5), cert. denied, 298 U. S. 688 (1936). See also Note, Federal Court Interference with the Assessment and Collection of

---

ers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts." *Perez* v. *Ledesma,* 401 U. S. 82, 128, n. 17 (1971) (concurring in part and dissenting in part).

State Taxes, 59 Harv. L. Rev. 780, 783, n. 13 (1946); Note, The Tax Injunction Act and Suits for Monetary Relief, 46 U. Chi. L. Rev. 736, 744, and nn. 40, 41 (1979).

Congress' response to this practice of the federal courts—enactment of § 1341—was motivated in large part by comity concerns.  As we said of the Act just last Term:

> "The statute 'has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations.' *Tully* v. *Griffin, Inc.*, 429 U. S. [68,] 73 [(1976)].  This last consideration was the principal motivating force behind the Act: this legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.  81 Cong. Rec. 1415 (1937) (remarks of Sen. Bone) . . . ."  *Rosewell* v. *LaSalle National Bank*, 450 U. S. 503, 522 (1981) (footnote omitted).

Neither the legislative history of the Act nor that of its precursor, 28 U. S. C. § 1342, suggests that Congress intended that federal-court deference in state tax matters be limited to the actions enumerated in those sections.  See H. R. Rep. No. 1503, 75th Cong., 1st Sess., 1 (1937); 81 Cong. Rec. 1415 (1937) (remarks of Sen. Bone).  Thus, the principle of comity which predated the Act was not restricted by its passage.

### C

The post-Act vitality of the comity principle is perhaps best demonstrated by our decision in *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293 (1943).  Several Louisiana taxpayers brought an action in Federal District Court seeking a declaratory judgment that the state tax law as applied to them was unconstitutional and void.  Although § 1341 was raised as a possible bar to the suit, as it has been raised in this case, "we [found] it unnecessary to inquire whether the words of the statute may be so construed as to prohibit a declaration by federal courts concerning the inva-

lidity of a state tax." 319 U. S., at 299. Instead, "we [were] of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require[d] a like restraint in the use of the declaratory judgment procedure." *Ibid.* Those considerations were, of course, principles of federalism:

> " 'The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it.' . . . Interference with state internal economy and administration is inseparable from assaults in the federal courts on the validity of state taxation, and necessarily attends injunctions, interlocutory or final, restraining collection of state taxes. These are the considerations of moment which have persuaded federal courts of equity to deny relief to the taxpayer . . . ." *Id.*, at 298 (quoting *Matthews* v. *Rodgers*, 284 U. S., at 525).

The Court's reliance in *Great Lakes* upon the necessity of federal-court respect for state taxing schemes demonstrates not only the post-Act vitality of the comity principle, but also its applicability to actions seeking a remedy other than injunctive relief. The focus was not on the specific form of relief requested, but on the fact that "in every practical sense [it] operate[d] to suspend collection of the state taxes until the litigation [was] ended." 319 U. S., at 299. As will be seen below, the relief sought in this case would have a similarly disruptive effect.

### D

The principle of comity has been recognized and relied upon by this Court in several recent cases dealing with matters other than state taxes. Its fullest articulation was

given in the now familiar language of *Younger* v. *Harris*, 401 U. S. 37 (1971), a case in which we held that traditional principles of equitable restraint bar federal courts from enjoining pending state criminal prosecutions except under extraordinary circumstances:

> "Th[e] underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways. . . . [T]he concept [represents] a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future." *Id.*, at 44–45.

The principles of federalism recognized in *Younger* have not been limited to federal-court interference in state criminal proceedings, but have been extended to some state civil actions. *E. g., Huffman* v. *Pursue, Ltd.*, 420 U. S. 592 (1975). Although these modern expressions of comity have been limited in their application to federal cases which seek to enjoin state judicial proceedings, a limitation which we do not abandon here, they illustrate the principles that bar petitioners' suit under § 1983. As we said in *Rosewell, supra*, "the reasons supporting federal noninterference [with state

taxation] are just as compelling today as they were in 1937." 450 U. S., at 527. As will be seen in the next part, petitioners' § 1983 action would be no less disruptive of Missouri's tax system than would the historic equitable efforts to enjoin the collection of taxes, efforts which were early held barred by considerations of comity.

## IV

In arguments primarily addressed to the applicability of the Act, petitioners contend that damages actions are inherently less disruptive of state tax systems than injunctions or declaratory judgments, and therefore should not be barred by prior decisions of this Court. Petitioners emphasize that their § 1983 claim seeks recovery from individual state officers, not from state coffers, and that the doctrine of qualified immunity will protect such officers' good-faith actions and will thus avoid chilling their administration of the Missouri tax scheme.

We disagree. Petitioners will not recover damages under § 1983 unless a district court first determines that respondents' administration of the County tax system violated petitioners' constitutional rights. In effect, the district court must first enter a declaratory judgment like that barred in *Great Lakes.* We are convinced that such a determination would be fully as intrusive as the equitable actions that are barred by principles of comity.[7] Moreover, the intrusive-

---

[7] Other federal courts have reached this same conclusion. For example, in *Advertiser Co.* v. *Wallace,* 446 F. Supp. 677, 680 (MD Ala. 1978), the court concluded that "[a]lthough perhaps less coercive than anticipatory relief and less intrusive than a refund, the damage award plaintiff seeks, especially its request for punitive damages, still is designed to deter collection of the taxes now being assessed by defendants." And the court in *Evangelical Catholic Communion, Inc.* v. *Thomas,* 373 F. Supp. 1342, 1344 (Vt. 1973), correctly stated:

"It is elementary that constitutional rights must be found to have been abridged in order for damages to be recovered in a civil rights action. Thus the plaintiffs in this action cannot recover damages without a deter-

ness of such § 1983 actions would be exacerbated by the nonexhaustion doctrine of *Monroe* v. *Pape*, 365 U. S. 167 (1961). Taxpayers such as petitioners would be able to invoke federal judgments without first permitting the State to rectify any alleged impropriety.

In addition to the intrusiveness of the judgment, the very maintenance of the suit itself would intrude on the enforcement of the state scheme. As the District Court in this case stated:

> "To allow such suits would cause disruption of the states' revenue collection systems equal to that caused by anticipatory relief. State tax collection officials could be summoned into federal court to defend their assessments against claims for refunds as well as prayers for punitive damages, merely on the assertion that the tax collected was willfully and maliciously discriminatory against a certain type of property. Allowance of such claims would result in this Court being a source of appellate review of all state property tax classifications." 478 F. Supp. 1231, 1233–1234 (1979).

This intrusion, although undoubtedly present in every § 1983 claim, is particularly highlighted by the facts of this case. Defendants are not one or two isolated administrators, but virtually every key tax official in St. Louis County. They include the County Executive, the Director of Revenue, the Tax Assessor, and three supervising members of the State Tax Commission. In addition, the actions challenged in the complaint—unequal assessment of new and

---

mination by this court that the taxation of their Newbury property was effected in violation of their constitutional rights. If we were to make such a determination, we would, in effect, be issuing a declaratory judgment regarding the constitutionality of the tax levied on the plaintiffs. As the court is prohibited from issuing such a declaratory judgment, . . . the court is also precluded as a matter of law from adjudicating the plaintiffs' damages claims."

old property and retaliatory assessment of property belonging to those who successfully appeal to the Board of Equalization—may well be the result of policies or practicalities beyond the control of any individual officer. For example, failure annually to reassess old property may well result from a practical allocation of limited resources. In addition, according to respondents' attorney at oral argument, Missouri law requires that all property, including property which belongs to those who successfully appeal to the Board of Equalization, be assessed at 33⅓% of market value. Thus, a judicial determination of official liability for the acts complained of, even though necessarily based upon a finding of bad faith, would have an undeniable chilling effect upon the actions of all County officers governed by the same practicalities or required to implement the same policies. There is little doubt that such officials, faced with the prospect of personal liability to numerous taxpayers, not to mention the assessment of attorney's fees under 42 U. S. C. § 1988, would promptly cease the conduct found to have infringed petitioners' constitutional rights, whether or not those officials were acting in good faith. In short, petitioners' action would "in every practical sense operate to suspend collection of the state taxes . . . ," *Great Lakes*, 319 U. S., at 299, a form of federal-court interference previously rejected by this Court on principles of federalism.

## V

This case is therefore controlled by principles articulated even before enactment of § 1983 and followed in later decisions such as *Matthews* and *Great Lakes*. The recovery of damages under the Civil Rights Act first requires a "declaration" or determination of the unconstitutionality of a state tax scheme that would halt its operation. And damages actions, no less than actions for an injunction, would hale state officers into federal court every time a taxpayer alleged the requisite elements of a § 1983 claim. We consider such interfer-

ence to be contrary to "[t]he scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts." *Matthews*, 284 U. S., at 525.

Therefore, despite the ready access to federal courts provided by *Monroe* and its progeny, we hold that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts. Such taxpayers must seek protection of their federal rights by state remedies, provided of course that those remedies are plain, adequate, and complete,[8] and may ultimately seek review of the state decisions in this Court. See *Huffman* v. *Pursue, Inc.*, 420 U. S., at 605; *Matthews* v. *Rodgers, supra*, at 526.

The adequacy of available Missouri remedies is not at issue in this case. The District Court expressly found "that [petitioners] have means to rectify what they consider an unjust situation through the state's own processes," 478 F. Supp., at 1234, and petitioners do not contest this finding. In addition, the Missouri Supreme Court has expressly held that plaintiffs such as petitioners may assert a § 1983 claim in state court. See, *e. g., Stafford* v. *Muster*, 582

---

[8] We discern no significant difference, for purposes of the principles recognized in this case, between remedies which are "plain, adequate, and complete," as that phrase has been used in articulating the doctrine of equitable restraint, and those which are "plain, speedy and efficient," within the meaning of § 1341. See, *e. g., Tully* v. *Griffin, Inc.*, 429 U. S. 68, 73–74 (1976); *Hillsborough* v. *Cromwell*, 326 U. S. 620, 622–623 (1946); *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S., at 297–299; *Matthews* v. *Rodgers*, 284 U. S., at 525–526. Both phrases refer to the obvious precept that plaintiffs seeking protection of federal rights in federal courts should be remitted to their state remedies if their federal rights will not thereby be lost. Numerous federal decisions have treated the adequacy of state remedies, and it is to that body of law that federal courts should look in seeking to determine the occasions for the comity spoken of today.

S. W. 2d 670, 681 (1979); *Shapiro* v. *Columbia Union National Bank & Trust Co.*, 576 S. W. 2d 310 (1978).

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE STEVENS, and JUSTICE O'CONNOR join, concurring in the judgment.

I agree that the judgment of the District Court dismissing petitioners' complaint should be affirmed. But I arrive at that conclusion by a different route for I cannot agree that this case, and the jurisdiction of the federal courts over an action for damages brought pursuant to express congressional authority, is to be governed by applying a "principle of comity" grounded solely on this Court's notion of an appropriate division of responsibility between the federal and state judicial systems. Subject only to constitutional constraints, it is exclusively Congress' responsibility to determine the jurisdiction of the federal courts. Federal courts have historically acted within their assigned jurisdiction in accordance with established principles respecting the prudent exercise of equitable power. But this practice lends no credence to the authority which the Court asserts today to renounce jurisdiction over an entire class of damages actions brought pursuant to 42 U. S. C. § 1983.

I

Petitioners J. David Cassilly and Lynn F. Cassilly are owners of real property in St. Louis County, Mo. Petitioner Fair Assessment in Real Estate Association, Inc. (FAIR), is a not-for-profit corporation formed by real estate taxpayers in St. Louis County to promote equitable enforcement of the real property tax laws of the State of Missouri. Respondents are public officials responsible for the execution of the real property tax laws in St. Louis County. On July 2, 1979,

petitioners filed this action in the United States District Court for the Eastern District of Missouri, pursuant to 42 U. S. C. § 1983, contending that respondents had willfully, intentionally, and systematically deprived them of their rights to due process and equal protection under the Fourteenth Amendment through inequitable property tax assessments. Petitioners alleged that respondents assessed properties with recent improvements at roughly 33⅓% of current true market value, and older homes on the average of 22½% of current market value. Further they alleged that respondents targeted for reassessment all real property upon which a successful appeal had been prosecuted in the prior year. The Cassillys sought compensatory damages measured by the difference between the taxes which they paid in several years prior to the action, and the amount they contended would have been owing had they been assessed at the average rate. They sought further compensation for expenses they had incurred in their sporadic attempts to remedy the alleged unlawful assessment by resort to the state administrative mechanisms, and substantial punitive damages against each respondent. FAIR sought money damages in the amount of expenses incurred in the course of its efforts to obtain equitable enforcement of the state real property tax law.

The District Court dismissed the complaint, holding that the action was barred by the Tax Injunction Act and principles of comity.[1]  478 F. Supp. 1231. The judgment of the District Court was affirmed by an equally divided vote of the Court of Appeals for the Eighth Circuit sitting en banc. 622 F. 2d 415.

---

[1] The court focused on the claims of the Cassillys, the individual petitioners, dismissing FAIR's complaint because it is "obviously in the same position as the individual plaintiffs." Petitioners do not challenge that determination in this Court, but rather concede that the "case turns" solely on the claims of the individuals. Reply Brief for Petitioners 4, n. 2; Brief for Petitioners 8.

## II

The opinion for the Court sets the "principle of comity" against the strong policies of 42 U. S. C. § 1983 favoring a federal forum to vindicate deprivations of federal rights, and resolves the issue in favor of comity.   In my view, there is no conflict here that could conceivably justify the unprecedented step of renouncing our assigned jurisdiction.   Indeed the very cases relied on by the Court in its attempt to find some historic source for its sweeping view of the "principle of comity," reveal the limits of that principle as a source of judicial authority.

As employed by the Court in several recent opinions, and in the opinion of the Court today, the "principle of comity" refers to the "proper respect for state functions" that organs of the National Government, most particularly the federal courts, are expected to demonstrate in the exercise of their own legitimate powers.   See *Younger* v. *Harris*, 401 U. S. 37, 44–45 (1971).   So employed, the "principle of comity" is nothing more than an encapsulation of policy, albeit policy with roots in the Constitution and our federal system of government.[2]

While the "principle of comity" may be a source of judicial policy, it is emphatically no source of judicial *power* to renounce jurisdiction.[3]   The application of the comity principle

---

[2] To recognize the nature of the principle does not, of course, detract from the fact that its manifestations can be clearly seen in the cases of this Court, and in the Acts of Congress, long before *Younger* v. *Harris*.   Indeed, the historic treatment of state tax litigation in the cases of this Court, and in Congress, provides an excellent illustration of the settled scope of the comity principle as a source of both judicial and congressional doctrine.   The Court's failure today to acknowledge the substantive limits of the principle may in part be the product of the fact that the "principle of comity" is not at all tied to concrete language in any constitutional or statutory provision.   See L. Tribe, American Constitutional Law § 3–41 (1978).

[3] The distinction between federal court jurisdiction and the exercise of equitable power did not escape Chief Justice Stone writing for the Court in *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293 (1943):

has thus been limited to a relatively narrow class of cases: Only where a federal court is asked to employ its historic powers as a court of equity, and is called upon to decide whether to exercise the broadest and potentially most intrusive form of judicial authority, does "comity" have an established and substantial role in informing the exercise of the court's discretion.[4]    There is little room for the "principle of

---

"This Court has recognized that the federal courts, in the exercise of the sound discretion which has traditionally guided courts of equity in granting or withholding *the extraordinary* relief which they may afford, will not ordinarily restrain state officers from collecting state taxes where state law affords an adequate remedy to the taxpayer.    *This withholding of extraordinary relief by courts having the authority to give it is not a denial of the jurisdiction which Congress has conferred on the federal courts* . . . .    On the contrary, it is but a recognition that the jurisdiction conferred on the federal courts embraces suits in equity as well as law, and that a federal court of equity, which may in an appropriate case refuse to give its special protection to private rights when the exercise of its jurisdiction would be prejudicial to the public interest, should stay its hand in the public interest when it reasonably appears that private interests will not suffer.

"It is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states."    *Id.*, at 297–298 (citations omitted; emphasis added).

[4] "Abstention" is often cited as an application of the comity principle. See, *e. g.*, Wells, The Role of Comity in the Law of Federal Courts, 60 N. C. L. Rev. 59, 63–68 (1981).    Not surprisingly then, we have applied the abstention doctrine only in equity actions.    See *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496, 500 (1941) ("The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication"); *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 318 (1943) ("as a matter of sound equitable discretion").

In *Pullman*, the Court described the equitable origins of the rule:

"An appeal to the chancellor . . . is an appeal to the 'exercise of the sound discretion which guides the determination of courts of equity'. . . .    The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. . . . Few public interests have a higher claim upon the discretion of a federal

comity" in actions at law where, apart from matters of administration, judicial discretion is at a minimum.[5] Surely no judicial power to fashion novel doctrine concerning the jurisdiction of the federal courts is to be found in the Constitution itself, which provides that the judicial power "shall be vested

chancellor than the avoidance of needless friction with state policies . . . ." 312 U. S., at 500.

But even assuming "abstention" might have some application in actions at law, cf. *Clay* v. *Sun Insurance Office Ltd.*, 363 U. S. 207 (1960) (certifying a question to the state court in a legal action), it is quite clear that the doctrine would not extend so far as wholly to deprive the litigant of his federal forum. The abstention doctrines are founded on the recognition that state, not federal, courts are the final expositors of state law, and thus reflect a justifiable diffidence on the part of federal courts confronted with novel state law questions.

Abstention is thus narrowly drawn to meet the particularized need it serves. The federal court remains open to the litigant to present his federal claim should the action for which he is remitted to state court fail to afford relief. *England* v. *Louisiana State Board of Medical Examiners*, 375 U. S. 411 (1964). See also *Louisiana Power & Light Co.* v. *City of Thibodaux*, 360 U. S. 25, 29 (1959) ("This course does not constitute abnegation of judicial duty. On the contrary, it is a wise and productive discharge of it. There is only postponement of decision for its best fruition").

Principles of comity are also reflected in federal habeas practice. While current habeas jurisdiction is wholly a statutory matter, 28 U. S. C. § 2254, comity surely played a part in the development of the exhaustion requirement. See *Ex parte Royall*, 117 U. S. 241 (1886). But the judicial creation of that requirement reflected no usurpation of judicial power. Issuance of the Great Writ was historically regarded as a matter of equitable discretion. See *Fay* v. *Noia*, 372 U. S. 391, 438 (1963).

[5] This is not to suggest that there is no occasion to apply principles of comity in actions at law. The doctrine of exhaustion of administrative remedies, while based primarily on concerns of judicial administration, see *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51 (1938), and which reflects principles of avoidance of unnecessary litigation, deference to administrative expertise, and "notions of administrative autonomy," see *McKart* v. *United States*, 395 U. S. 185, 194–195 (1969), is surely broad enough to encompass comity concerns as well. Cf. *First National Bank of Greeley* v. *Board of Commissioners of Weld County*, 264 U. S. 450 (1924). But the role of comity must narrow with the scope of judicial discretion, and, in regard to suits seeking monetary relief, that discretion is limited.

in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish." U. S. Const., Art. III, § 1.

The Court relies primarily on *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293 (1943), to support its sweeping view of the comity principle. *Great Lakes* presented the question whether the Tax Injunction Act could be "so construed as to prohibit a declaration by federal courts concerning the invalidity of a state tax." *Id.*, at 299. We found no need to address that question, holding instead that "those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure." *Ibid.* From this the Court today reasons:

> "Petitioners will not recover damages under § 1983 unless a district court first determines that respondents' administration of the County tax system violated petitioners' constitutional rights. In effect, the district court must first enter a declaratory judgment like that barred in *Great Lakes.* We are convinced that such a determination would be fully as intrusive as the equitable actions that are barred by principles of comity." *Ante*, at 113.

*Great Lakes* does not support this reasoning. Our opinion there suggests nothing intrusive in bringing a claim involving a question of state taxation to a federal forum. Dismissal of the suit was permissible only because the claim for declaratory relief was designed to gain "an adjudication of rights in anticipation of their threatened infringement."[6] Such a

---

[6] The Court explained the equitable foundations of anticipatory relief:

"The jurisdiction of the district court in the present suit, praying an adjudication of rights in anticipation of their threatened infringement, is analogous to the equity jurisdiction . . . . Called upon to adjudicate what is essentially an equitable cause of action, the district court was as free as in

suit, precisely like one for an injunction, would "in every practical respect operate to suspend collection of the state taxes until the litigation is ended."[7]   319 U. S., at 299.   No similar concern is raised by the present case.[8]

The jurisdiction of the federal courts over cases such as the present one reflects a considered congressional judgment. As the Court acknowledges, § 1983 "gave a federal cause of action to prisoners, taxpayers, or anyone else who was able to prove that his constitutional or federal rights had been denied by any State."   *Ante*, at 103–104.   In addition, 42 U. S. C. § 1981 provides that "[a]ll persons . . . shall be subject to like punishment, pains, penalties, *taxes*, licenses, and exactions of every kind, and to no other."[9]   (Emphasis added.)   Congress has expressly provided jurisdiction over such claims in the district courts.[10]   28 U. S. C. § 1343; see

---

any other suit in equity to grant or withhold the relief prayed, upon equitable grounds."   319 U. S., at 300.

[7] A similar desire to ensure that state and local governments not be deprived of the use of tax proceeds until the lawfulness of the levy was finally determined, was largely responsible for enactment of the Tax Injunction Act.   See *infra*, at 129–130, and n. 16.

[8] The Court suggests that if the District Court determines that the assessments in question here were unlawful, the state officials "would promptly cease the conduct found to have infringed petitioners' constitutional rights," and thus the determination of unlawfulness would operate to "suspend" collection of state taxes.   *Ante*, at 115.   But I would never have thought this result something to be avoided.   The *Great Lakes* rule seeks to avoid withholding tax funds from local authorities until the tax is determined to be unlawful, not afterwards.

[9] The Civil Rights Act that became § 1981 was passed by Congress in 1868.   The reference to "taxes" was added in 1870.   See *County of San Mateo* v. *Southern Pacific R. Co.*, 13 F. 145, 151 (CC Cal. 1882) (Justice Field).   At least one state tax case seeking a damages remedy has involved a claim under § 1981.   *Garrett* v. *Bamford*, 538 F. 2d 63 (CA3 1976).

[10] Actions challenging the constitutionality of state taxation have also been held to fall within the general federal question jurisdiction, 28 U. S. C. § 1331.   See, *e. g.*, *Raymond* v. *Chicago Union Traction Co.*, 207 U. S. 20, 35 (1907) ("The claim that the action of the state board of equal-

*Zwickler* v. *Koota*, 389 U. S. 241, 245–248 (1967).[11]   Where Congress has granted the federal courts jurisdiction, we are not free to repudiate that authority.   *Ibid.;*[12] *England* v. *Louisiana State Board of Medical Examiners*, 375 U. S. 411 (1964).   In *England* we said:

ization in making the assessment under consideration was the action of the State, and if carried out would violate the provisions of the Fourteenth Amendment to the Constitution of the United States, by taking property of the appellee without due process of law, and by failing to give it the equal protection of the laws, constitutes a Federal question beyond all controversy"); *County of San Mateo* v. *Southern Pacific R. Co., supra; Louisville & N. R. Co.* v. *Bosworth*, 230 F. 191 (ED Ky. 1915).

[11] The jurisdictional grant reflects a congressional policy pronouncement on the role of the federal courts in our federal system.   The Civil Rights Acts, passed between 1866 and 1875, and made federally cognizable by 28 U. S. C. § 1343(3), were followed by the Act of Mar. 3, 1875, which granted the federal courts jurisdiction over all federal statutory and constitutional questions where the requisite amount in controversy was met.   § 1, 18 Stat. 470.   It hardly disparages the current standing of the state courts as qualified adjudicators of federal rights exercising jurisdiction concurrent with that of the federal courts, to note that at the time of the enactment there was a more than modest distrust of the state courts as protectors of federal rights, see *Mitchum* v. *Foster*, 407 U. S. 225, 238–242 (1972), and that "[b]y that statute '. . . Congress gave the federal courts the vast range of power which had lain dormant in the Constitution since 1789.   These courts ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.'"   *Zwickler* v. *Koota*, 389 U. S. 241, 247 (1967) (emphasis in the opinion), quoting F. Frankfurter & J. Landis, The Business of the Supreme Court: A Study in the Federal Judicial System 65 (1927).

[12] We stated in *Zwickler:*

"Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims.   Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States . . . .'   'We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject

"There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims. Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred special categories of jurisdiction upon the federal courts, and with the principle that 'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction . . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.' *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 40." *Id.*, at 415 (footnote omitted).

The power to control the jurisdiction of the lower federal courts is assigned by the Constitution to Congress, not to this Court. In its haste to rid the federal courts of a class of cases that it thinks unfit for federal scrutiny, the Court today departs from this fundamental precept.

### III

Subject of course to constitutional constraints, the jurisdiction of the lower federal courts is subject to the plenary control of Congress. *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 233–234 (1922); *Cary* v. *Curtis*, 3 How. 236, 245 (1845). As pointed out *supra*, at 123–124, and n. 11, this case appears to fall squarely within the jurisdictional grant of 28 U. S. C. § 1343, and perhaps of 28 U. S. C. § 1331 as well. The question, then, is whether Congress has anywhere contradicted that presumptive grant of judicial author-

for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.'" 389 U. S., at 248 (citations omitted).

ity. Only one possible source of that contradiction having been suggested, I begin my analysis of the jurisdictional question with the Tax Injunction Act itself.

### A

Title 28 U. S. C. § 1341 provides:

> "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

If a suit brought under § 1983 for damages is to come within the prohibition of the Act, it would seem necessary to demonstrate that such a suit is one to "enjoin, suspend or restrain the assessment, levy or collection" of a state tax. Respondents argue that the terms "suspend" and "restrain" are words of ordinary usage, and that they are sufficiently broad to bring the present suit for damages, which respondents assert will "chill" state tax collection, within the proscriptions of the Act. In my view, the legislative history of the Act, and the case law background against which it was written, directly refute the suggestion that Congress intended those words to have the encompassing meaning respondents suggest.[13]

### B

The federal courts have for most of their history been scrupulous in the exercise of their equitable powers to avoid unnecessary interference with the administration of state taxation. In *Dows* v. *Chicago*, 11 Wall. 108 (1871), Justice Field noted:

---

[14] I might also question whether these terms are totally devoid of specialized legal meaning, for they surely seem to evoke association with the language of equitable actions. See, *e. g.*, *Dows* v. *Chicago*, 11 Wall. 108, 110 (1871) ("No court of equity will . . . allow its injunction to issue to *restrain* their action . . .") (emphasis added); *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S., at 299 ("suspend collection of the state taxes until the litigation is ended").

"It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public." *Id.*, at 110.

Thus it was early held that the illegality or unconstitutionality of a state or municipal tax would not in itself provide the foundation for equitable relief in the federal courts. *Id.*, at 109; see *Boise Artesian Water Co.* v. *Boise City,* 213 U. S. 276, 282–285 (1909).[14] Consistent with equity practice, the federal courts would not enjoin the collection of state taxes, despite the possible unconstitutionality of the exaction, where there existed a "plain, adequate and complete remedy at law." *Singer Sewing Machine Co.* v. *Benedict,* 229 U. S. 481, 488 (1913).

Although this Court, in the many cases preceding passage of the Tax Injunction Act, affirmed the need for restraint in the exercise of the power of equity in state tax cases, it never intimated that the federal forum was inappropriate where the complaint sought only a remedy in damages, and the case was otherwise within federal jurisdiction. Indeed, the Court re-

---

[14] To be cognizable in a court of equity, it was understood that "the case must be brought within some of the recognized foundations of equitable jurisdiction, and that mere errors or excess in valuation, or hardship or injustice of the law, or any grievance which can be remedied by a suit at law, either before or after payment of taxes, will not justify a court of equity to interpose by injunction to stay collection of a tax." *State Railroad Tax Cases,* 92 U. S. 575, 614 (1876). The limitations of federal equity practice in 1876 intensified the need for restraint. Because the equity court was limited to enjoining the collection of the tax as a whole, the effect of injunctive relief was to allow the complainant to escape payment of all taxes due, even though the portion that reflected the lawful assessment should, in justice, have been paid. *Id.*, at 614–615.

peatedly stated the contrary. See *id.*, at 486; *Henrietta Mills* v. *Rutherford County*, 281 U. S. 121, 127 (1930); *Chicago, B. & Q. R. Co.* v. *Osborne*, 265 U. S. 14, 16 (1924). For example, in *Henrietta Mills*, a unanimous Court concluded that there was no basis for equitable relief, relying on the fact that there would have been "an adequate remedy at law, not only in the state court, *but also in the Federal court if petitioner had been able to show a violation of the Federal Constitution.*" 281 U. S., at 127 (emphasis added). And indeed damages actions for wrongful collection of taxes, brought against both the taxing authority and the taxing officials, were not unknown to the lower federal courts. See, *e. g.*, *Tyler* v. *Dane County*, 289 F. 843 (WD Wis. 1923); *International Paper Co.* v. *Burrill*, 260 F. 664 (Mass. 1919). In *Matthews* v. *Rodgers*, 284 U. S. 521 (1932), only five years prior to the enactment of the Tax Injunction Act, we summarized the federal practice:

> "Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, . . . *or to his suit at law in the federal courts if the essential elements of federal jurisdiction are present.*" *Id.*, at 525–526 (citations omitted; emphasis added).

In sum, while the federal courts, prior to the passage of the Tax Injunction Act, would frequently refrain from exercising their equitable powers in state tax cases, damages actions were an established fixture of federal jurisdiction.

C

Although in 1932 *Matthews* v. *Rodgers* stated a broad principle of restraint in the exercise of federal equity powers,

*ibid.*, the rule was soon honored more in breach than in observance. Purporting to construe these equitable principles in state tax cases, the federal courts had become "free and easy with injunctions."[15] Thus federal remedial practice began to contrast sharply with the limits on state remedial authority, with the result that the federal court became the preferred forum for those who could properly invoke its jurisdiction: principally large out-of-state corporations. The legislative history of the Tax Injunction Act makes plain Con-

---

[15] *England* v. *Louisiana State Board of Medical Examiners*, 375 U. S., at 431 (Douglas, J., concurring).

Two features of federal equity practice explained this willingness to grant equitable relief. The first was the construction that this Court placed on the equitable maxim that equity jurisdiction does not lie where there exists an adequate legal remedy. The Court had held that the "adequate legal remedy" must be one cognizable *in federal court.* *City Bank Co.* v. *Schnader*, 291 U. S. 24, 29 (1934). Where the limitations on federal jurisdiction would preclude adjudication of the suit for monetary relief, either because of the mandate of the Eleventh Amendment, or otherwise, the barrier to federal injunctive intervention was thus removed. The States had for the most part denied their courts the power to grant anticipatory relief against the collection of taxes. See Culp, The Powers of a Court of Equity in State Tax Litigation, 38 Mich. L. Rev. 610, 618–631 (1940). It was this imbalance in the powers of the state and federal judicial systems that was "particularly remedied" by passage of the Tax Injunction Act. H. R. Rep. No. 1503, 75th Cong., 1st Sess., 3 (1937).

The second feature was that the federal courts, in construing strictly the requirement that the remedy available at law be "plain, adequate and complete," see *supra*, at 127, had frequently concluded that the procedures provided by the State were not adequate. See Note, Federal Court Interference with the Assessment and Collection of State Taxes, 59 Harv. L. Rev. 780, 782–783 (1946). The Tax Injunction Act set forth a more deferential standard by which to evaluate the adequacy of the state remedy. See *Rosewell* v. *LaSalle National Bank*, 450 U. S. 503 (1981). Thus, in this respect too, the Tax Injunction Act limited the equitable range of the district court and brought federal court practice more closely into line with that of state courts—which assuredly were required to act within the bounds of state law and procedure without regard to whether the federal courts considered that law and procedure "plain, adequate and complete."

gress' concern with this disparity, and its effect on local finances. In introducing the bill that ultimately became the Tax Injunction Act, Senator Bone explained:

"The existing practice of the Federal courts to entertain tax-injunction suits make[s] it possible for foreign corporations [exercising the diversity jurisdiction] to withhold from a State and its governmental subdivisions taxes in such vast amounts and for such long periods as to disrupt State and county finances, and thus make it possible for such corporations to determine for themselves the amount of taxes they will pay." 81 Cong. Rec. 1416 (1937).

The Senate Report highlighted the nature of the problem being addressed:

"[U]njust discrimination between citizens of the State and foreign corporations doing business in such State has been the cause of much controversy. *The controversies arising out of the use of the injunctive process in State tax cases would be eliminated by the passage of this bill.*" S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937) (emphasis added).[16]

---

[16] The Report further noted:

"It is the common practice for statutes of the various States to forbid actions in State courts to enjoin the collection of State and county taxes unless the tax law is invalid or the property is exempt from taxation, and these statutes generally provide that taxpayers may contest their taxes only in refund actions after payment under protest. This type of State legislation makes it possible for the States and their various agencies to survive while long-drawn-out tax litigation is in progress. If those to whom the Federal courts are open may secure injunctive relief against the collection of taxes, the highly unfair picture is presented of the citizen of the State being required to pay first and then litigate, while those privileged to sue in the Federal courts need only pay what they choose and withhold the balance during the period of litigation.

"The existing practice of the Federal courts in entertaining tax-injunction suits against State officers makes it possible for foreign corpora-

Not only does the legislative focus belie respondents' suggestion that Congress believed the federal courts not competent to handle matters involving state taxation, but the legislative history addresses directly respondents' principal contention that Congress intended the phrase "enjoin, suspend or restrain" to bar actions for monetary relief from the federal courts. The Report of the House Judiciary Committee appends a "Legal Brief" submitted to the Committee with respect to the proposed bill, which states:

> "You ask for some assistance on the question of whether the existence of an adequate remedy at law or in equity in the State courts, such as a tax-refund action, would prevent a foreign corporation pursuing the same remedy in the Federal court. In answer, *[sic]* will say that there might be circumstances under which the Federal courts would have no jurisdiction of such actions; for instance, where the refund action could be brought only against the State, or against the State officers under such circumstances as to amount to a suit against the State. Under the eleventh amendment to the Federal Constitution, of course, suits against the State, or suits which are in effect suits against the State, are not maintainable in the Federal courts.
>
> "But if the refund action is permitted by State legislation or rules of decision against counties or county officers, and the money refunded has not yet reached the State exchequer, such actions, if maintainable in the

tions doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy." S. Rep. No. 1035, at 1–2.

State courts, could likewise be pursued in the Federal courts if the requisite elements of Federal jurisdiction existed." H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2–3 (1937).[17]

The conclusion is thus inescapable that Congress did *not* intend to bar actions such as this one from the federal courts. On the contrary, Congress clearly intended that the federal forum would continue to remain available in state tax cases for monetary relief despite passage of the Tax Injunction Act.

### D

As understood and applied by this Court prior to the passage of the Tax Injunction Act,[18] and by Congress in enacting the Tax Injunction Act, the "principle of comity" which demanded respect for state tax administration, extended precisely as far as was necessary to ensure that the federal courts not become party to the abuse of their equity power. Congress intended that federal authority be exercised with the same restraint that the States applied in the administration of their own tax system, and thus to restore the parity between the two judicial systems. But there is absolutely no support in either the cases of this Court, or in Congress'

---

[17] The brief quotes from many of the cases discussed in Part III–B, *supra*, supporting the view that the federal forum would continue to be available.

To be sure, the House and Senate Reports focus on actions brought under diversity jurisdiction. But this emphasis merely reflects the fact that Congress was particularly concerned about the advantage conferred on out-of-state corporations by virtue of diversity jurisdiction. Just as it was unlikely that Congress, by enacting 28 U. S. C. § 1341, sought to limit federal equity power only in diversity cases, see *Rosewell* v. *LaSalle National Bank*, 450 U. S., at 522–523, n. 29, it is implausible that Congress wished to ensure the continued availability of diversity jurisdiction in actions at law, while implicitly barring damages actions arising under the Constitution and laws of the United States.

[18] And in the cases that succeeded the Act. See *supra*, at 122–123.

action, for total abdication of federal power in this field. It is thus entirely clear that as a jurisdictional matter, the federal courts have jurisdiction over claims seeking monetary relief arising from unconstitutional state taxation.

## IV

Petitioners argue that since their federal claim is brought pursuant to 42 U. S. C. § 1983, it was not necessary to exhaust administrative remedies before commencing this action.

In *First National Bank of Greeley* v. *Board of Commissioners of Weld County*, 264 U. S. 450 (1924), we held that before a litigant complaining of alleged overassessment of taxes may bring a damages action grounded on the Constitution or statutes of the United States, that litigant must fully exhaust any administrative remedies afforded by the State.[19] In *Weld County*, plaintiff in error brought its action under federal question jurisdiction to recover the amount of taxes levied for the years 1913 and 1914. It alleged that the taxes were assessed and collected in contravention of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and a federal statute[20] setting forth certain limitations

---

[19] See *Apartments Bldg. Co.* v. *Smiley*, 32 F. 2d 142, 143 (CA8 1929). A like rule applied in equity actions. See *Gorham Mfg. Co.* v. *State Tax Comm'n*, 266 U. S. 265, 269–270 (1924); *First National Bank of Greenville* v. *Gildart*, 64 F. 2d 873, 874–875 (CA5 1933); *McDougal* v. *Mudge*, 233 F. 235, 237 (CA8 1916).

[20] Revised Statutes § 5219 allowed state and local taxation of the shares of a national bank "subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, and that the shares of any national banking association owned by non-residents of any State shall be taxed in the city or town where the bank is located, and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either State, county, or municipal taxes, to the same extent, according to its value, as other real property is taxed."

on state and local taxation in regard to national banks.[21]   The Court paused before addressing plaintiff in error's substantive claim:

"We are met at the threshold of our consideration of the case with the contention that the plaintiff did not exhaust its remedies before the administrative boards and consequently cannot be heard by a judicial tribunal to assert the invalidity of the tax." *Id.*, at 453.

Because the plaintiff in error had not exhausted its state administrative remedies, the Court declined to consider the "question whether the tax [was] vulnerable to the challenge in respect of its validity upon any or all of the grounds set forth . . . ."[22]  *Id.*, at 456.

Although the Court did not elaborate on the underpinnings of that holding, it seems clear that it was grounded on the considerations of sound judicial administration[23] and parity between the state and federal judicial systems that had his-

---

[21] Plaintiff in error charged that the "banks of Weld county were assessed and compelled to pay upon a valuation grossly in excess of that put upon other property in the same county and likewise in excess of that put upon other banks in other counties of the State."   264 U. S., at 452–453.

[22] The exhaustion rule stated in *Weld County*, reflecting the established practice in state tax matters, was limited to exhaustion of *administrative*, but not *judicial*, remedies.   See *id.*, at 456; Stason, Judicial Review of Tax Errors—Effect of Failure to Resort to Administrative Remedies, 28 Mich. L. Rev. 637, 659, and n. 47 (1930) ("In no case, so far as the present examination of authorities has disclosed, has it been held that the taxpayer must resort to available modes of direct attack by *judicial* proceedings, before proceeding with collateral attack, except in injunction cases in which an injunction is refused because of the adequacy of the legal remedy").

[23] In *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41 (1938), which set forth the exhaustion requirement with respect to federal administrative remedies, Justice Brandeis noted that the exhaustion rule had frequently been applied in equity cases.   *Id.*, at 51, n. 9.   "But," he added, "because the rule is one of judicial administration—not merely a rule governing the exercise of discretion—it is applicable to proceedings at law as well as suits in equity," *ibid.*, citing *Weld County*.

torically guided the federal equity courts and were later embodied in the Tax Injunction Act. Those principles, and *Weld County*, govern the treatment of actions at law involving state tax matters.

Petitioners seek to avoid the reach of *Weld County* by arguing that this case is to be controlled by the general rule stated in *McNeese* v. *Board of Education*, 373 U. S. 668 (1963), that in cases brought pursuant to 42 U. S. C. § 1983, resort to state administrative remedies is not a precondition to federal suit. As a factual matter of course, it is difficult to distinguish *Weld County*, which raised factual allegations that closely parallel those of the complaint at issue here.[24]

More importantly, while this Court has repeatedly reaffirmed that exhaustion of administrative remedies is not a precondition to a suit brought under the Civil Rights Acts,

---

[24] Petitioners seek to distinguish this case from *Weld County*, arguing that in *Weld County* the action was brought against the county directly, and was thus in effect a suit for a refund for which exhaustion might be appropriate, while this action has been brought pursuant to 42 U. S. C. § 1983 against officials of the county, seeking damages. The distinction is unpersuasive. Any relief obtained by petitioners through the administrative process would, of course, reduce the potential damages liability of these defendants. Moreover, a city or county might itself be susceptible to suit under 42 U. S. C. § 1983 where (as is apparently the allegation here) it is alleged that the unlawful assessments are an artifact of official policy. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). Petitioners should not be able to circumvent the exhaustion requirement by designedly not bringing suit against the single potential defendant to have actually benefited from the collection of the allegedly unlawful tax.

Finally, petitioners' argument is particularly inapt in this case. Many of the officials named as defendants have no small involvement in the administrative process. It surely seems appropriate that before being held accountable in court those officials have the opportunity fully to consider petitioners' claims within the administrative forum that provides the only basis for their involvement in this matter. See *McKart* v. *United States*, 395 U. S., at 195.

Of course, it is unnecessary to decide whether the allegations in the complaint at issue here do state a claim under 42 U. S. C. § 1983.

see, *e. g.*, *Ellis* v. *Dyson*, 421 U. S. 426, 432–433 (1975); *Steffel* v. *Thompson*, 415 U. S. 452, 472–473 (1974); *Carter* v. *Stanton*, 405 U. S. 669, 670–671 (1972); *Wilwording* v. *Swenson*, 404 U. S. 249, 251 (1971) *(per curiam); King* v. *Smith*, 392 U. S. 309, 312, n. 4 (1968); *Damico* v. *California*, 389 U. S. 416, 416–417 (1967) *(per curiam)*, that conclusion rests firmly on the understanding that such was the intention of Congress in enacting § 1983. Where Congress has provided that in a particular class of cases the federal courts should refrain from hearing suits brought under § 1983 until administrative remedies have been exhausted, see, *e. g.*, 42 U. S. C. § 1997e (1976 ed., Supp. IV), there is no doubt that the federal courts are bound by that limitation. Cf. *Preiser* v. *Rodriguez*, 411 U. S. 475, 489–490 (1973). My view has always been that displacement of § 1983 remedies can only "be justified by a clear statement of congressional intent, or, at the very least, by the presence of the most persuasive considerations of policy."[25] *Id.*, at 518 (BRENNAN, J., dissenting). Surely a somewhat lesser showing is required where, as here, we are concerned not with the displacement of the § 1983 remedy, but with the deferral of federal court consideration pending exhaustion of the state *administrative* process. Where the obligation to require exhaustion of administrative remedies may be fairly understood from congressional action, or is in accord with congressional policy, not only is § 1983 no bar, but the federal courts should be alert to further those policies.

We plainly have sufficient evidence of such congressional policy here. As noted above, in enacting the Tax Injunction Act, Congress sought to assure that the federal courts would remain open to suits for monetary relief in state tax cases "if

---

[25] I dissented in *Preiser* because I saw insufficient justification there to warrant displacement of the § 1983 remedy in favor of a habeas corpus procedure involving exhaustion of state judicial remedies.

the requisite elements of Federal jurisdiction existed." H. R. Rep. No. 1503, 75th Cong., 1st Sess., 3 (1937).[26] In 1937 the requirement of exhaustion of state administrative remedies was certainly a mandatory precondition to suit, and in that sense a "jurisdictional prerequisite." Nevertheless, we need not reach the conclusion that Congress intended by enactment of the Tax Injunction Act to freeze the then-operative jurisdictional practice of the federal courts in order to recognize that the administrative-exhaustion requirement is entirely consonant with the principal purposes of the Act: to provide assurance that federal courts exercise at least the same restraint in dealing with questions of state tax administration as the courts of the State that levied the tax. Where administrative remedies are a precondition to suit for monetary relief in state court, absent some substantial consideration compelling a contrary result in a particular case, those remedies should be deemed a precondition to suit in federal court as well.[27]

---

[26] See also H. R. Rep. No. 1503, at 4: " '[T]he aggrieved party is left to . . . his suit at law in the Federal courts if the essential elements of Federal jurisdiction are present' " (quoting *Matthews* v. *Rodgers*, 284 U. S. 521, 525–526 (1932)).

[27] In *Perez* v. *Ledesma*, 401 U. S. 82, 128, n. 17 (1971) (concurring in part and dissenting in part), I noted the policies that have motivated both judicial and congressional restraint in this field:

"The special reasons justifying the policy of federal noninterference with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to

## V

Petitioners sought damages arising from what they alleged to be unconstitutional assessments in four tax years. In 1974 and 1975, they failed to pursue in any manner the administrative remedies provided by the State. In 1977 they appealed their assessment to the St. Louis County Board of Equalization and gained substantial relief. Although they claim here that the relief granted by the Board of Equalization failed to bring their assessment up to constitutional standards, they failed to appeal the Board's ruling for that year to the State Tax Commission. An appeal of their 1978 assessment was pending before the State Tax Commission at the time they brought this action.

Because petitioners failed to exhaust their administrative remedies in each tax year for which they seek damages, their complaint was properly dismissed. To the extent today's judgment affirms that dismissal, I concur.

---

turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts."

Thus I recognize, as does the Court, those considerations that have prompted federal restraint in matters of state taxation. My quarrel with the Court is that in my view those concerns can be, and historically have been, addressed by means far less drastic than the judicial abnegation of federal court jurisdiction. The administrative-exhaustion requirement squarely meets those concerns. Indeed, the problems perhaps least well met by the administrative-exhaustion requirement are adequately served by other established mechanisms of federal restraint: the possibility of an unwarranted financial burden on the taxing authority during the pendency of litigation is directly addressed by the Tax Injunction Act itself and our restriction on the use of the declaratory judgment procedure; the primacy of the state courts as expositors of state tax law prevails through application of principles of abstention as enunciated in *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941).