Felix CRUZ, Plaintiff,

v.

Dr. Barry JORDAN, et al., Defendants.

No. 98 CIV. 0363(AKH).

United States District Court,
S.D. New York.

July 28, 1999.

Opinion on Reconsideration Dec. 22, 1999.

Daniel Haym Weiner, Hughes Hubbard & Reed, New York, NY, for Felix Cruz.

Felix Cruz, Stormville, NY, pro se.

Valerie Singleton, Dennis C. Vacco, Atty General of the State of NY, New York, NY, for Barry Jordan.

Dennis C. Vacco, Atty General of the State of NY, New York, NY, for Green Haven C.F.

Valerie Singleton, Atty General of the State of NY, New York, NY, for C.O. M. Prusak, A.D. Miller, Ms. Fish-Gerald, Dr. Selwin, Dr. Mamis, C.O. M. Coryers.

## OPINION

HELLERSTEIN, District Judge.

Plaintiff Felix Cruz brings this action pursuant to 42 U.S.C. § 1983 seeking monetary damages for injuries he suffered due to defendants' alleged deliberate indifference to his medical needs. Defendants move pursuant to Federal Rule of Civil Procedure 12(b) to dismiss the action on the ground that plaintiff failed to exhaust his administrative remedies pursuant to the exhaustion requirement of the Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, 110 Stat. 1321 (1996) ("PLRA"). *See* 42 U.S.C. § 1997e(a).[1]

I grant defendants' motion to the extent of ordering this action stayed to permit exhaustion of "such administrative remedies as are available." *Id.* I hold that an action alleging deliberate indifference to medical needs is an action "brought with respect to prison conditions," requiring ex-

---

**1.** Defendants also moved to dismiss claims asserted against the New York institutional defendants and against the individual defendants in their official capacities as barred by the Eleventh Amendment to the United States Constitution. Plaintiff concedes the point and offer to withdraw these claims, leaving only the claims against the individuals in their individual capacities. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, dated November 16, 1998, at 14; Transcript of Oral Argument, March 26, 1999, at 12. Defendants' motion pursuant to the Eleventh Amendment is thus granted to the extent conceded.

haustion, and that New York State provides administrative remedies that are available to prevent, stop and mitigate deliberate indifference to the medical needs of prisoners. The administrative procedures still available to plaintiff also provide a fair and reliable forum in which to determine facts and responsibilities. Accordingly, I direct the State to provide an administrative hearing to determine, among other issues and to the extent feasible: (1) the cause of plaintiff's injuries and the aggravations thereof; (2) the past and present conditions of plaintiff's confinement in relation to his medical claims; (3) whether those conditions were and are reasonable in light of plaintiff's injuries and whether such conditions caused any delay or limitations in the healing process reasonably to be expected; and (4) any steps that remain available to ameliorate plaintiff's condition. I hold further that the hearings shall be on the record, permit the participation of counsel, and be concluded and transmitted to this Court within a period of 60 days, or such enlarged period as may be requested on good cause shown.

## I. Defendants' Alleged Misconduct: The Complaint

For purposes of this motion, the following facts alleged in the Complaint are presumed to be true. Plaintiff is an inmate in New York State's Green Haven Correctional Facility in Stormville, New York ("Green Haven"). On August 22, 1996, New York State prison officials transported plaintiff from Green Haven to Vassar Brothers Hospital in Poughkeepsie, New York, where plaintiff underwent surgery to repair a rupture in his abdominal wall and to remove a cyst. Plaintiff claims that the performing doctor failed to close his surgical wound prior to releasing him for his return to Green Haven (Compl. at 8),[2] and

that this and the allegations that follow reflected deliberate indifference to plaintiff's medical needs.

At Green Haven, plaintiff alleges, the doctors in its medical center failed to examine his surgical wound, put him directly in his cell where, later that evening after the anesthetic plaintiff received wore off, he found that his wound was open and bleeding profusely. (Compl. at 4–5). Plaintiff cried for help, but no one responded; the prison officials, plaintiff alleges, were indifferent to his calls. Plaintiff alleges that he fell unconscious, and was not discovered until morning, in a pool of his blood. He was brought back to the Green Haven medical center when, plaintiff alleges, a nurse on duty observed that the incision on his body showed no "sign of being stitched." (Compl. at 6).

Plaintiff required additional care, including additional surgery and hospitalization, requiring a stay of 357 days in Green Haven's medical center. Plaintiff alleges that he was unable to walk of his own power, required a walker or wheelchair, and fell twice suffering injury to his back. Again, plaintiff alleges, defendants ignored his pleas for help, and exacerbated his condition by forcing him to sleep on the floor of his cell for nearly two weeks without bed or bedding. (Compl. at 13).

On August 25, 1997, plaintiff filed a grievance for the denial of a bed and bedding. (Compl. at 15). Three days later, on August 28, 1997, plaintiff was transferred to another cell where he received proper bedding. (Id.). Plaintiff did not file a grievance concerning his claims of medical indifference.

## II. The Relevant Constitutional Standard

■ Title 42, section 1983, provides that "[e]very person who, under color of [law],

---

**2.** Plaintiff, first proceeding pro se and then by counsel, has filed multiple complaints. Citations to "Compl." refer to plaintiff's Second Amended Complaint, dated April 24, 1998, and filed while plaintiff was proceeding pro

se. The complaints filed by plaintiff's counsel, subsequent to the submission of this motion, do not affect the matters addressed herein.

subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983. Plaintiff, although imprisoned for having committed a crime, remains entitled to constitutional protections, among them the protection against "cruel and unusual punishments" guaranteed by the Eighth Amendment to the United States Constitution. Deliberate indifference by prison officials to serious medical needs of prisoners can violate the Eighth Amendment, *see Estelle v. Gamble*, 429 U.S. 97, 102–104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care...." *Id.* at 104–05, 97 S.Ct. 285.

▪ At the same time, however, the Court recognized that not every denial of medical needs rises to the level of a Constitutional violation: "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106, 97 S.Ct. 285. In order to state a claim under section 1983, a prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eight Amendment." *Id.* Objectively, the claim must be "sufficiently serious;" subjectively, the claim requires proof that an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994)

(internal quotation marks and citations omitted), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

### III. *The PLRA—The Governing Statute and its Legislative History*

#### A. *The Statute*

Section 1997e(a) of title 42 was enacted in 1996, and provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Defendants argue that plaintiff's claim of medical indifference is "brought with respect to prison conditions" and that plaintiff's failure to exhaust "such administrative remedies as are available" requires dismissal of his case. Plaintiff argues that section 1997e(a) does not apply because a claim for deliberate indifference to medical needs is not a claim "brought with respect to prison conditions" and because the remedy of monetary damages is not "available" in Green Haven's grievance procedures.

#### B. *The Legislative History*

The PLRA, as initially introduced in the House and the Senate, was part of two omnibus criminal law reform measures—the Taking Back Our Streets Act of 1995 in the House, and the Violent Crime Control and Law Enforcement Improvement Act of 1995 in the Senate. *See* Bernard D. Reams, Jr. & William H. Manz, *A Legislative History of the Prison Litigation Reform Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321,* Docs. No. 32 & 33 (1997) ("PLRA Legislative History").[3] The bills

---

**3.** This excellent two-volume compendium of legislative material concerning the PLRA organizes the various pieces of legislative history, including floor statements, drafts of bills and hearing testimony, under sub-parts that include some fifty-six specific documents.

Each sub-part is an individual document and utilizes the pagination system adopted in the original document. The book does not contain a pagination system that covers the entire two-volume set. Accordingly, citations herein to the PLRA Legislative History will refer to

were intended to address numerous issues raised in then-recent political campaigns relating to crime, law enforcement and prisoners, and included proposals to change habeas corpus, criminal sentencing, the exclusionary rule, and other law enforcement programs. Ultimately, the PLRA was passed as a rider to an appropriations bill. *See Alexander v. Hawk,* 159 F.3d 1321, 1325 n. 8 (11th Cir.1998); *Garrett v. Hawk,* 127 F.3d 1263, 1265 n. 2 (10th Cir.1997).

The legislative history giving rise to the PLRA is relatively sparse. *See Beeson v. Fishkill Correctional Facility,* 28 F.Supp.2d 884, 891 (S.D.N.Y.1998) (Mukasey, J.) (noting that legislative history is "relatively meager"). Floor debates are perhaps the best source. *See Alexander,* 159 F.3d at 1325 n. 8; *Garrett,* 127 F.3d at 1265 n. 2; *see also Greig v. Goord,* 169 F.3d 165, 167 (2d Cir.1999) (relying upon statements of Senators Dole and Kyl). The legislative history that exists is scattered among all the other measures that were part of the omnibus legislation, and mostly relates to funding, consent decree and habeas corpus issues. *See, e.g.,* PLRA Legislative History, Hearing Before the Committee on the Judiciary, United States Senate, July 27, 1995, Statement of Senator Spencer Abraham, Doc. 55, at 101–02 (noting that hearings covered "several diverse, unrelated to some extent topics").[4]

The legislative history concerning the PLRA indicates that Congress was primarily concerned about the rising number of lawsuits filed by prisoners and the perception that most of these suits were frivolous. *See, e.g.,* 141 Cong.Rec. S14408–01,

*S14413 (daily ed. Sept. 27, 1995) (statement of Senator Dole) (noting that prisoner suits increased from 6,600 in 1975 to more than 39,000 in 1994 and included claims for "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and ... being served chunky peanut butter instead of the creamy variety"); 141 Cong.Rec. S14408–01, *S14418 (daily ed. Sept. 27, 1995) (statement of Senator Hatch) (noting that 297 inmate suits were filed in the state of Utah in 1994 and that these suits accounted for 22% of all the Federal civil cases filed in Utah in 1994); *id.* (statement of Senator Kyl) (referring to an inmate suit concerning denial of use of a Gameboy video game); 141 Cong.Rec. S7498–01, *S7526 (daily ed. May 25, 1995) (statement of Senator Kyl) (citing that in 1994, prisoners brought more than one-fourth of all civil suits filed in the United States District Courts: 60,086 of the 238,590 total suits filed). Some courts have echoed these concerns. *See, e.g., Greig,* 169 F.3d at 167 (quoting statement of Senators Dole and Kyl that filing lawsuits "has become a recreational activity for long-term residents of our prisons" to gain "a short sabbatical in the nearest Federal courthouse") (internal quotation marks omitted); *Alexander,* 159 F.3d at 1324; *Roller v. Gunn,* 107 F.3d 227, 230 (4th Cir.1997), *cert. denied,* 522 U.S. 874, 118 S.Ct. 192, 139 L.Ed.2d 130 (1997). The short title given to the House measure that contained the PLRA reflects this Congressional concern: "Stopping Abusive Prisoner Law-

---

the document number where the material is located and, where appropriate, the relevant page(s) within that document.

4. The House held one, two-day hearing on the legislation. *See* PLRA Legislative History, *supra,* Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, Taking Back Our Streets Act of 1995, January 19 & 20, 1995, Doc. 53. The Senate held two hearings on two days. One day was devoted exclusively to

habeas corpus reform. *See id.,* Hearing Before the Committee on the Judiciary, United States Senate, A Bill to Reform Habeas Corpus Procedures, And For Other Purposes, March 28, 1995, Doc. 54. The other day was devoted more broadly to six different pieces of legislation, including prison litigation reform. *See id.,* Hearing Before the Committee on the Judiciary, United States Senate, Prison Reform: Enhancing the Effectiveness of Incarceration, July 27, 1995, Doc. 55.

suits." PLRA Legislative History, *supra,* Doc. 33, at 61. As the House report on the omnibus reform package stated: "Too often prisoners initiate suits which are frivolous, malicious, or fail to state a claim for which relief can be granted. Such suits clog the courts, waste law enforcement resources, and hinder localities in their efforts to fight crime." PLRA Legislative History, *supra,* House Report, Committee on the Judiciary, Violent Criminal Incarceration Act of 1995, dated Feb. 6, 1995, Doc. 50, at 8.[5]

As to the PLRA's exhaustion requirement, there is little elaboration or explanation in the legislative history. *See, e.g.,* 141 Cong.Rec. S14408–01, *S14417 (daily ed. Sept. 27, 1995) (summarizing exhaustion requirement); PLRA Legislative History, *supra,* House Report, Committee on the Judiciary, Violent Criminal Incarceration Act of 1995, dated Feb. 6, 1995, Doc. 50, at 7 (same). The section-by-section summary of the House bill, the Taking Back Our Streets Act of 1995, described the exhaustion requirement as a tightening of the looser, discretionary standard that had previously been the law:

> [The Taking Back Our Streets Act of 1995] amends the CRIPA [Civil Rights of Institutionalized Persons Act] by requiring that all available administrative remedies be exhausted prior to a civil action being initiated on behalf of an inmate. Under CRIPA, courts were given the discretion of allowing for the exhaustion of administrative remedies, but were not required to do so. Under [the Taking Back Our Streets Act of 1995], that discretion is eliminated.

PLRA Legislative History, *supra,* Hearings Before the Subcommittee on the Judiciary, House of Representatives, January 19 & 20, 1995, Doc. 53, at 82; *see also id.,* Hearing Before the Committee on the Judiciary, United States Senate, July 27, 1995, Statement of Michael Gadola, Former Deputy Counsel to the Governor of the State of Michigan, Doc. 55, at 60 (endorsing elimination of judicial discretion in requiring exhaustion).

Congressman LoBiondo, paraphrasing a letter from former U.S. Attorney General Dick Thornburgh, commented that the administrative process at the prison level could assist the courts in fact-finding and focusing issues: "[A]n administrative review process would also aid the Federal courts by allowing for preliminary fact-finding and the creation of a record at the Bureau level, so as to clarify the issues to be presented to the court." 141 Cong.Rec. H14078–02, *H14105 (daily ed. Dec. 6, 1995). In a similar vein, Alvin J. Bronstein, Director, Prison Project, American Civil Liberties Union, testified that grievance procedures at the prison level could eliminate much litigation at the district court level. *See* PLRA Legislative History, *supra,* Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, January 19 & 20, 1995, Doc. 53, at 276 ("The real answer is, if prison systems had adequate grievance mechanisms and grievance procedures, they would themselves take care of 90 percent of this stuff."); Henry S. Friendly, Federal Jurisdiction: A General View 105 (1973) (discussed *infra,* part V.B).

---

**5.** Not everyone who appeared at the hearings shared these views. *See* PLRA Legislative History, *supra,* Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, January 19 & 20, 1995, Statement of Alvin J. Bronstein, Director, Prison Project, American Civil Liberties Union, Doc. 53, at 267–70 (emphasizing the important constitutional rights often vindicated by prisoner litigation and the decline in the relative number of such lawsuits); *id.,* Hearing Before the Committee on the Judiciary, United States Senate, July 27, 1995, Statement of Steve J. Martin, Attorney and Corrections Consultant on Prison and Jail Litigation, Doc. 55, at 79 (commenting that existing laws and rules on pleading adequately address most abusive prisoner litigation and urging Senate to strike a balanced approach that does not single out prisoners as a class).

Assuming, as I must, that plaintiff's claims are true for purposes of this motion to dismiss, they state a serious case. A valid, non-frivolous claim of deliberate indifference to medical needs is certainly one that should be litigated, and one that is cognizable under section 1983. Nonetheless, section 1997e(a) makes clear, confirmed by the legislative history, that a district court may not hear a suit "with respect to prison conditions" until the plaintiff has exhausted "such administrative remedies as are available." For the reasons that follow, I hold that this provision applies to plaintiff's claims.

IV. *A Claim Based Upon Medical Indifference Is a Claim "with respect to prison conditions" Under Section 1997e(a)*

■ Plaintiff argues that a claim for medical indifference is not a claim "with respect to prison conditions," and that there is therefore no requirement to exhaust administrative remedies. The argument is without merit.

■ The phrase prison conditions is not defined in section 1997e(a). However, section 3626(g)(2) of title 18, enacted also as part of the PLRA to address suits by prisoners for injunctions and other forms of prospective relief, defines "civil action with respect to prison conditions" as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison[.]" 18 U.S.C. § 3626(g)(2). The definition of this cognate provision should apply to the terms of section 1997e(a) as well. *See Beeson v. Fishkill Correctional Facility*, 28 F.Supp.2d 884, 888–892 (S.D.N.Y.1998) (Mukasey, J.). As Judge Mukasey reasoned, "[w]hen Congress, in one statute, uses the same words in two different places, those words should generally be read to mean the same thing in both places." *Id.* at 888; *see also Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 45 (2d Cir.1988) ("Construing

identical language in a single statute in pari materia is both traditional and logical."). Plaintiff's claims clearly concern "the effects of actions by government officials on the lives of persons confined in prison[.]" 18 U.S.C. § 3626(g)(2).

Though some of my colleagues have disagreed with *Beeson*'s holding, *see Wright v. Dee*, 54 F.Supp.2d 199, 203–204 (S.D.N.Y.1999) (Cote, J.); *Carter v. Kiernan*, No. 98 Civ. 2664(JGK), 1999 WL 14014, at *2–*5 (S.D.N.Y. Jan.14, 1999) (Koeltl, J.); *Baskerville v. Goord*, No. 97 Civ. 6413(BSJ), 1998 WL 778396, at *2–*5 (S.D.N.Y. Nov.5, 1998) (Jones, J.), at least two Judges, including Judge Cote in *Wright*, have explicitly held that claims for medical indifference are claims "with respect to prison conditions" under section 1997e(a). *See Wright*, 54 F.Supp.2d at 204–206; *Vasquez v. Artuz*, No. 97 Civ. 8427(AJP), 1999 WL 440631, at *5 (S.D.N.Y. June 28, 1999) (collecting cases). And even Judge Koeltl in *Carter* and Judge Jones in *Baskerville* recognized, in dictum, that claims for deliberate indifference to medical needs are claims "with respect to prison conditions." *Carter*, 1999 WL 14014, at *2–*5 (claim of excessive force by prison guard held not governed by definition of prison conditions contained in section 3626(g)(2) and thus not subject to exhaustion; but stating that "[t]he ordinary, contemporary, common meaning of the phrase 'prison conditions' refers to such things as medical treatment"); *Baskerville*, 1998 WL 778396, at *2–*5 (reaching same result for slightly different reasons with respect to claim of excessive force, but noting that exhaustion "ordinarily would be required ... [for a] medical treatment claim because these claims do concern prison conditions").

I thus hold that plaintiff's claim concerning defendants' deliberate indifference to his medical needs is an action "with respect to prison conditions;" both because the natural reading of that phrase includes such claims and because such allegations concern "the effects of actions by govern-

ment officials on the lives of persons confined in prison[.]" 18 U.S.C. § 3626(g)(2). Accordingly, I hold that plaintiff's claim that doctors and guards mistreated him and ignored his calls for help is governed by the exhaustion requirement of section 1997e(a).

## V. *Section 1997e(a) Applies to Actions for Monetary Damages*

Plaintiff argues that because monetary damages—the remedy he seeks herein—are not "available" to him in the administrative proceedings at Green Haven, section 1997e(a) should not apply. I hold, however, that the exhaustion requirement of section 1997e(a) remains applicable.

### A. *The Administrative Grievance Procedures Available to Plaintiff*

New York provides an elaborate administrative grievance process for prisoners in New York State correctional facilities. *See* Inmate Grievance Program ("IGP"), N.Y.Comp.Codes R. & Regs, tit. 7, §§ 701.1–701.16 (1995). The program is designed to provide inmates with an "orderly, fair, simple and expeditious method of resolving grievances. . . ." *Id.* § 701.1(a).

A "grievance" is broadly defined: "A complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a policy, regulation, procedure or rule." *Id.* § 701.2(a).[6] Each prison maintains an Inmate Grievance Resolution Committee ("IGRC"), which is required "to resolve grievances or make recommendations for the resolution of the grievances filed." *Id.* § 701.7(a). It consists of five members: two voting inmates, two voting staff members, and a non-voting chairperson. *Id.* § 701.4(a).

Grievances are to be submitted to the IGRC within 14 days of the alleged occurrence, with exceptions "based on mitigating circumstances." *Id.* § 701.7(a)(1). For example, the 14–day limitation is not applicable to "referrals back to the IGP by the courts." *Id.* The grievance is to be alleged by a "concise, specific description of the problem and the action requested and [an indication of] what actions the grievant has taken to resolve the complaint[.]" *Id.* § 701.7(a)(1)(i). A sample grievance complaint form is provided to facilitate the inmate's task. *Id.* § 701.16. Like grievances may be grouped to permit resolution at one time. *Id.* § 701.7(a)(2).

Two options are provided to resolve grievances: informal or formal via a hearing. Informal resolutions are to be accomplished within seven working days, with the resolution and the grievant's consent to be entered. *Id.* § 701.7(3). The hearing mandated for formal resolution must also take place within seven working days. *Id.* § 701.7(4). The grievant "shall be afforded an opportunity to appear," and has the power to call witnesses and present "relevant information, comments, or other evidence." *Id.* § 701.7(a)(4)(i) & (iv). The IGRC must either dismiss the grievance or resolve it on the merits. Grievances can be dismissed on any of five grounds, and that ground must be stated in the IGRC's resolution. *Id.* § 701.7(a)(5)(i) & (ii). If the IGRC elects to resolve the grievance on the merits, the IGRC is to deliberate in private session after the close of the hearing and communicate its decision to the inmate-grievant within two days. *Id.* § 701.7(a)(4)(v).

A two-step appeal process is provided. At the first level, the grievant, or any direct party to the grievance, may appeal to the Superintendent. *Id.* § 701.7(b)(1). Such an appeal must be filed within four working days after receipt of the IGRC's written decision. *Id.* The Superintendent then determines which of two categories the appeal falls under—either a departmental or institutional issue. *Id.*

---

**6.** Certain categories of dispute, not relevant here, are specifically exempt from this broad definition. *See* N.Y.Comp.Codes R. & Regs., tit. 7, § 701.3(e)(1) & (2).

§ 701.7(b)(4) & (5). Depending on which category the appeals falls under, the Superintendent is required to take particular courses of action, within, respectively, either a five working day time frame or a ten working day time frame. *Id.* From this decision, an appeal can be taken to the Central Office Review Committee ("CORC"), which consists of deputy and assistant commissioners of the Department of Correctional Services, or their designees. *Id.* §§ 701.6(a) & 701.7(c). The CORC's decisions have the force of formal directives, and the CORC is required to consider broader institutional concerns in resolving appeals. *Id.* § 701.6(a) & (b). Again, a specific time frame for filing the appeal is mandated, and the CORC must transmit a decision, "with reasons stated," within 20 working days from the time the appeal was received. *Id.* § 701.7(c)(4).

A specific set of regulations covers grievances related to harassment, *id.* § 701.11, which is defined to include "[a]llegations of employee misconduct meant to annoy, intimidate or harm an inmate." *Id.* § 701.2(e).[7] The preamble to these regulations states that such allegations "are of particular concern to the administrators of department facilities" and that, accordingly, an "expedited procedure" for review shall be followed. *Id.* § 701.11. First, an inmate is directed to bring such conduct to the attention of the employee's supervisor. *Id.* § 701.11(b)(1). The Superintendent is directed to determine if the grievance is a bona fide case of harassment. *Id.* § 701.11(b)(3). If the Superintendent so determines, the grievance remains on an expedited track for prompt resolution, *id.* § 701.11(b)(4)–(6); if the Superintendent determines that it is not bona fide, the grievance is submitted to the IGRC for resolution in conformance with the general structure discussed above, *id.* § 701.11(b)(3). As to bona fide claims of

harassment, the Superintendent is required to either:

(i) initiate an in-house investigation by higher ranking supervisory personnel into the allegations contained in the grievance; or

(ii) request an investigation by the inspector general's office or, if the superintendent determines that criminal activity is involved, by the New York State Police Bureau of Criminal Investigation.

*Id.* § 701.11(b)(4)(i) & (ii). The Superintendent is required to deliver a decision "with reasons" within 12 working days of receipt of the grievance. *Id.* § 701.11(b)(5). Extensions of time are permitted, but only with the written consent of the grievant. *Id.* In addition, if the Superintendent fails to respond to the grievance within the required time limitation, the grievant may file an appeal directly to the CORC. *Id.* § 701.11(6).

The IGP also contains detailed procedural safeguards for selecting members of the IGRC and CORC, *id.* §§ 701.4–701.6, and an ethical code of conduct, *id.* §§ 701.10(b) & 701.15. Inmates may object to the participation of particular inmates on the IGRC. *Id.* § 701.10(d). No member of the IGRC "shall obstruct an inmate from exercising his or her right to file a grievance nor ridicule an inmate or his or her grievance." *Id.* § 701.15(a)(1). The proceedings are to be confidential, and the records of the grievance are to be maintained for at least three years. *Id.* § 701.10(b)(2). Finally, all time periods in the regulations may be relaxed only with the written consent of the grievant, *id.* § 701.8, and the regulations discussed herein may be bypassed only for emergency situations, *id.* § 701.9.

---

7. The regulations also provide a mechanism for resolving grievances based on claims of unlawful discrimination, N.Y.Comp.Codes R. & Regs., tit. 7 § 701.12, which is defined to include "acts or policies which adversely affect individuals based on race, religion, national origin, sex, sexual orientation, age, disabling condition(s) or political belief, except as provided by law." *Id.* § 701.2(f).

B. *The Inmate's Obligation to Exhaust in a Suit for Money Damages*

■ Plaintiff argues that section 1997e(a) does not apply because he cannot obtain monetary damages at the administrative level. There are, however, available administrative remedies, and section 1997e(a) requires only that such remedies "as are available" be exhausted before a lawsuit is to proceed. *See Alexander,* 159 F.3d at 1326–28; *Beeson,* 28 F.Supp2d at 892–96 (comprehensive analysis and review by Judge Mukasey); *Funches v. Reish,* No. 97 Civ. 7611(LBS), 1998 WL 695904, at *7–*9 (S.D.N.Y. Oct.5, 1998); *see also Vasquez,* 1999 WL 440631, at *5–*8 (following *Beeson* ). *But see Whitley v. Hunt,* 158 F.3d 882, 885–87 (5th Cir.1998); *Lunsford v. Jumao-As,* 155 F.3d 1178, 1179 (9th Cir.1998); *Garrett v. Hawk,* 127 F.3d 1263, 1266 (10th Cir.1997); *Davis v. Frazier,* No. 98 Civ. 2658(HB), 1999 WL 395414, at *4 (S.D.N.Y. June 15, 1999).

■ The starting and ending point of this analysis must be the text of the statute. There is no basis in the text of section 1997e(a) to require that the remedies sought by an inmate be identical as between administrative and judicial proceedings. By its plain terms, section 1997e(a) provides that "[n]o action shall be brought . . . until such administrative remedies as are available are exhausted." Thus, the requirement of exhaustion applies to whatever administrative remedies are available in a correctional facility, regardless whether they may be different from the remedies that are available in a subsequent judicial proceeding. In short, if there is a remedy available at the administrative level, it must be pursued by the inmate and exhausted before filing suit in this Court.

There is much to be gained by requiring a plaintiff to exhaust available administrative procedures even where the remedies provided by those procedures are not identical with the remedies sought in a judicial proceeding. This case involved the internal regulations and procedures of a prison relating to medical care given to prisoners, the adequacy of such regulations and procedures, whether they were followed in relation to plaintiff and the consequences of any failure on the part of the prison system. A policy requiring exhaustion of administrative remedies promotes efficiency by giving the administrative body responsible for interpreting and living with the applicable regulations and procedures an opportunity to apply its expertise and knowledge before the federal courts become involved. *See Alexander,* 159 F.3d at 1327. The ability to create a record of the conduct and actions complained of by those close to the scene with intimate knowledge of facts, people and circumstances can be of invaluable assistance in arriving at just and expeditious results, limiting the need for prolonged, imperfect and often difficult discovery in federal court. *See id.; see also McCarthy v. Madigan,* 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (noting that exhaustion "may produce a useful record for subsequent judicial consideration"); *Beeson,* 28 F.Supp.2d at 895 ("The administrative process can serve to focus and clarify the issues for a court—a function that is especially beneficial in a field dominated by pro se litigation."). And a requirement that administrative remedies first be exhausted gives the prison an opportunity to halt violative practices and take ameliorative steps to mitigate damages. *See Alexander,* 159 F.3d at 1327; Friendly, *infra,* Federal Jurisdiction: A General View ("The state, which has a special concern with the rehabilitation or incapacitation of persons convicted of violating its penal laws, also has a special responsibility to give them decent treatment and to impose only such restrictions on rights accorded other citizens as are necessary to prevent further disorder and escape.").

There are additional benefits. Compliance with the IGP enables Green Haven better to understand the problems, if any, that gave rise to plaintiff's injuries, and to take steps to see to it that such incidents

do not happen again. As the Supreme Court commented, in *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), one of the benefits of exhaustion is that it provides an agency with "an opportunity to correct its own errors." *See also Beeson*, 28 F.Supp.2d at 895 (reasoning that "strict adherence to the PLRA's exhaustion requirement will likely result in a more efficient grievance procedure and, as a consequence, lead to the improvement of prison conditions"); PLRA Legislative History, *supra*, Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, January 19 & 20, 1995, Statement of Alvin J. Bronstein, Director, Prison Project, American Civil Liberties Union, Doc. 53, at 276 ("The real answer is, if prison systems had adequate grievance mechanisms and grievance procedures, they would themselves take care of 90 percent of this stuff."). As the detailed regulatory scheme for the IGP makes clear, the prison system in New York has a comprehensive set of guidelines for resolving inmates' claims. The purpose of these regulations is to create a grievance procedure that is "orderly, fair, simple and expeditious," with a "particular concern" for the type of harassment claims that plaintiff raises. N.Y.Comp.Codes R. & Regs, tit. 7, §§ 701.1(a) & 701.11. The regulations evince a clear intent to resolve problems internally and to do so quickly and efficiently.

More than two decades ago, Judge Henry J. Friendly described the benefits served by requiring exhaustion in prisoner litigation:

> My first proposition is that if a state has provided suitable administrative remedies for hearing prisoner complaints, these must be exhausted. While, as stated, I favor a general requirement of exhaustion of state administrative remedies, the reasons for this are particularly compelling here. Such a step would help substantially to stem the rising tide of prisoner civil rights complaints, provided that the states develop adequate administrative schemes.... The state, which has a special concern with the rehabilitation or incapacitation of persons convicted of violating its penal laws, also has a special responsibility to give them decent treatment and to impose only such restrictions on rights accorded other citizens as are necessary to prevent disorder and escape. Moreover, the administrative process is far better suited than the judicial to deal with complaints, many of them minor, emanating from such large government run institutions as the prisons.

Henry J. Friendly, Federal Jurisdiction: A General View 105 (1973). Today, the Court of Appeals has embraced a similar view of the benefits served by imposing a general exhaustion requirement:

> In general, exhaustion of administrative remedies is the rule, and waiver the exception, because exhaustion serves myriad purposes, including limiting judicial interference in agency affairs, conserving judicial resources, and preventing the "frequent and deliberate flouting of administrative processes [that] could weaken the effectiveness of an agency." *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *see also Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir.1996). Exhaustion also allows the agency to develop the factual record of the case, which aids such judicial review as may be available. *See James v. United States Dep't of Health & Human Servs.*, 824 F.2d 1132, 1137–38 (D.C.Cir.1987).

*Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 93–94 (2d Cir.) (alteration in original), *cert. denied*, —— U.S. ——, 119 S.Ct. 539, 142 L.Ed.2d 448 (1998). These views apply with equal force when considered in the context of the specific language adopted in section 1997e(a).

The cases which hold that because money damages are not available in the administrative process there are no "available" administrative remedies are not persua-

sive. *See Beeson,* 28 F.Supp.2d at 888 (collecting cases). As the earlier discussion makes clear, there are ample available administrative remedies, and the statute requires, not a complete coincidence of remedies but, rather, exhaustion of only "such administrative remedies as are available."

The pre-PLRA version of section 1997e(a) gave a court discretion to require exhaustion in a prisoner's section 1983 action where the court believed that exhaustion would be "appropriate and in the interests of justice" and where the administrative remedies available were "plain, speedy, and effective." The statute provided:

> Subject to the provisions of paragraph (2), in any action brought pursuant to section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such case for a period not to exceed 180 days in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available.

42 U.S.C. § 1997e(a)(1) (1994) (amended 1996). The PLRA now makes exhaustion mandatory, in favor of "such administrative remedies as are available." *See Funches,* 1998 WL 695904, at *8 (discussing the substantial differences between the pre- and post-PLRA versions of section 1997e). In light of the prior conditional language, it may well have been appropriate to require an identity of remedies. *See e.g., Woods v. Fitzpatrick,* No. 96 Civ. 1120(DAB), 1999 WL 221108, at *4–*5 (S.D.N.Y. Apr.14, 1999) (applying prior version of section 1997e(a) and holding that unavailability of monetary relief at the administrative level rendered the exhaustion requirement inapplicable). The statutory change is significant, and courts have a duty to give it content. *See Alexander,* 159 F.3d at 1326–27 (discussing prior ver-

sion of section 1997e(a) and emphasizing critical differences in statutory language in holding that identity of remedies is not required); *Beeson,* 28 F.Supp.2d at 893 (reasoning that imposing requirement of adequate relief effectively reintroduces the very language that Congress deleted).

Congress passed section 1997e(a) to apply to the general class of prisoner section 1983 litigation, including litigation seeking money damages, the predominant type of such litigation. If the exhaustion requirement could be bypassed where monetary relief is requested, the requirement would effectively cease to exist for most section 1983 claims. The Congressional intent would thus be frustrated. *See, e.g., Beeson,* 28 F.Supp.2d at 893; *Funches,* 1998 WL 695904, at *9. Thus, based upon the text of section 1997e(a) and because of the policy reasons underlying the exhaustion requirement, I hold that plaintiff is required to exhaust all "such administrative remedies as are available" before this action can proceed, even though monetary damages are not available in the IGP.

VI. *The Appropriateness of a Stay, Rather than Dismissal*

■ Because I find that section 1997e(a) applies to plaintiff's claims, and that plaintiff failed to exhaust the administrative remedies available to him, I must determine the appropriate remedy. For the reasons that follow, rather than dismiss this action without prejudice, I order that it be stayed pending exhaustion of the available administrative remedies and pending further report of Green Haven's grievance review board.

Section 1997e(a), although it does not mandate dismissal, does provide that "[n]o *action shall be brought* ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). In general, and in a wide range of matters, courts frequently dismiss an action without prejudice—as opposed to with prejudice—for failure to exhaust remedies, administrative or otherwise. *See,*

*e.g., Shenandoah v. United States Dep't of Interior,* 159 F.3d 708, 715 (2d Cir.1998) (claims concerning a land dispute with the U.S. Government); *Carter v. United States,* 150 F.3d 202, 205 & n. 4 (2d Cir. 1998) (habeas); *Basil Cook Enter., Inc. v. St. Regis Mohawk Tribe,* 117 F.3d 61, 69 (2d Cir.1997) (tribal remedies); *Criales v. American Airlines, Inc.,* 105 F.3d 93, 95 (2d Cir.) (Title VII; noting that "[l]ike any other dismissal for failure to exhaust administrative remedies, a dismissal … is not a bar to instituting the suit [once the remedies are exhausted]"), *cert. denied,* 522 U.S. 906, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997). In the specific context of dismissals under section 1997e(a), other courts have indicated that dismissal without prejudice is the proper result. *See, e.g., Samuels v. Jackson,* No. 97 Civ. 2420(MBM), 1999 WL 92617, at *2 n. 3 (S.D.N.Y. Feb.22, 1999) (dicta); *Melo v. Combes,* No. 97 Civ. 0204(JGK), 1998 WL 67667, at *5 (S.D.N.Y. Feb.18, 1998). However, as an alternative, it is also appropriate to stay an action pending exhaustion. *See Basil Cook Enter.,* 117 F.3d at 65 n. 2 ("Under the doctrine of exhaustion of tribal remedies, the district court was permitted either to enter a stay of all proceedings or to dismiss the complaint without prejudice" (citing *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 20 n. 14, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987))), *Johnson v. Nyack Hosp.,* 86 F.3d 8, 11 (2d Cir.1996) (noting, in the context of the interaction between primary jurisdiction referrals in antitrust cases and the running of the statute of limitations, that the Court of Appeals has not expressed a preference between staying an action or dismissing an action without prejudice).

Either course equally serves the Congressional purpose, to permit the administrative agency, or other responsible reviewing authority, to make a record and to apply its expertise to the specific problem. *See McCarthy,* 503 U.S. at 145, 112 S.Ct. 1081; *Weinberger,* 422 U.S. at 765, 95 S.Ct. 2457. Indeed, New York's IGP specifically contemplates that it can function following remand from the courts. Thus, the regulations specifically note that exceptions to a grievant's time limit for filing suit (14 days) may be made for "mitigating circumstances," including *"referrals back to the IGP by the courts[.]"* N.Y.Comp. Codes R. & Regs, tit. 7, § 701.7(a)(1) (1995) (emphasis added). A remand during a period of stay allows the IGP's comprehensive system for resolving inmate's grievances to function, thereby assisting the courts in resolving claims by focusing and clarifying issues. *See Alexander,* 159 F.3d at 1327–28; *Beeson,* 28 F.Supp.2d at 895.

At the same time, the administrative process, however helpful, is not sufficient to complete the task of adjudication. The courts have a non-delegable duty to try and determine, with a jury if requested, the issues raised in section 1983 cases filed by prisoners. The courts may be aided by the work of administrative agencies, but the role of courts and juries may not be usurped. In cases properly brought before the district courts, court and jury must go on to try and determine the issues raised by the complaint. In all of this, the judicial function can be enormously helped, and truth and the merits can be substantially advanced, by a respectful adherence to developed administrative procedures, as under New York's IGP. That is what Congress intended.

Nor does remanding this action to Green Haven for exhaustion and, upon exhaustion, resuming the action here for monetary damages amount to some form of impermissible claim splitting. First, as noted above, the very reason courts dismiss actions without prejudice for failure to exhaust is to enable the action to be recommenced following exhaustion. Second, in related areas of law, this is standard practice. For example, where an action is filed in which some, but not all, claims are subject to arbitration, district courts are granted discretion to stay judicial proceedings pending arbitration. *See, e.g.,*

*Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 856 (2d Cir.1987) (decision to stay court proceedings while part of an action is submitted to arbitration rests "largely within the district court's discretion to control its docket"); *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 838 (E.D.N.Y.1995) (staying some claims while other proceeded to arbitration). Similarly, under the doctrine of primary jurisdiction, where courts refer matters to an agency with particular expertise in an area of law, courts sometimes refer only part of an action, and retain others for adjudication. *See, e.g., Hansen v. Norfolk and Western Railway Co.,* 689 F.2d 707, 710–14 (7th Cir.1982) (action involving ICC tariff and antitrust claims; held that antitrust action would be stayed pending the ICC's determination on tariff issues because that determination would assist the court in resolving the antitrust claims); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 637 F.Supp. 382, 388 (S.D.N.Y. 1986) (staying case where it was unclear whether plaintiffs could obtain complete relief on claims subject to a primary jurisdiction referral).

In sum, in light of the history of this case and the familiarity I have gained, no good purpose is served by dismissing without prejudice. Accordingly, I hold that this action should be stayed pending exhaustion of the available administrative remedies. Thus, I will be able to monitor the progress of the administrative remand to insure that it is properly and timely completed. I therefore remand to the IGP at Green Haven for a hearing pursuant to the applicable regulations and procedures set forth above. Plaintiff's counsel may participate in the hearings, all testimony should be transcribed and preserved so that it may be used in this action, and a full record should be made. Among other issues, the IGPC shall, to the extent feasible, determine: (1) the cause of plaintiff's injuries and the aggravations thereof; (2) the past and present conditions of plaintiff's confinement in relation to his medical claims; (3) whether those conditions were

and are reasonable in light of plaintiff's injuries and whether such conditions caused any delay or limitations in the healing process reasonably to be expected; and (4) any steps that remain available to ameliorate plaintiff's condition.

### *CONCLUSION*

For the reasons stated, because plaintiff failed to exhaust the administrative remedies available at Green Haven with respect to his claims for medical indifference, defendants' motion is granted and this action is stayed pending exhaustion of those remedies. All claims asserted against the institutional defendants and the individual defendants sued in their official capacities are dismissed with prejudice and without costs. Counsel for both sides shall submit a status letter to the Court within 60 days from the date of this Order concerning the status of the administrative proceedings at Green Haven.

SO ORDERED.

### *OPINION*

On July 28, 1999, I issued an Opinion and Order staying this prisoner's "1983" lawsuit to permit him to exhaust "such administrative remedies as may be available." *See* at 111. I so ordered after the New York State Attorney General had represented that administrative remedies were available with respect to plaintiff's allegations of serious, permanent physical injuries caused by defendants' medical indifference. Am. Compl. ¶¶ 30, 37; Def. Ltr. in Response to Court Interrogatories, Dated April 14, 1999.

Defendants now move for reconsideration and renewal of their motion to dismiss, arguing that the Prison Litigation Reform Act ("PLRA") mandates dismissal rather than a stay, that the procedures I suggested upon remand are unavailable and cannot constitutionally be required, and that plaintiff's claims are now time barred. Upon reconsideration, I adhere to my Opinion and Order of July 28, with

certain modifications and additions to my previous rulings. Specifically, I hold:

1. A district court has equitable jurisdiction to stay an action in the context of the particular facts of a particular case, and is not compelled by the PLRA to dismiss it while the prisoner exhausts possibly available administrative remedies. I thus adhere to my previous decision.

2. Plaintiff cannot have been expected to invoke the state's grievance procedures while suffering the direct impact of the medical inattention that caused him to become unconscious from uncontrolled bleeding, and during at least some portion of his hospitalization. Defendants may plead and prove, however, as an affirmative defense, that plaintiff could have improved his health and physical condition and, consequently, mitigated his damages, if he had availed himself of the state's grievance procedures at some point in his illness.

3. The state, by expressing unwillingness to accept a remand from this court, even though contemplated by the state's regulations, see, Id. at 116–17, citing N.Y. Comp.Code R. & Regs. tit. 9, § 701.7(a)(1), or to engage in the administrative factfinding I requested as to how and why plaintiff's injuries occurred and whether and to what extent plaintiff can be made better, or to hold a hearing on the record with counsel present, shows that there are no further available administrative remedies relevant to the cause before me. Accordingly, this case may now proceed in this Court in regular course.

## I. *A Stay, Rather than a Dismissal, is an Appropriate Remedy in this Case.*

Defendants argue that the exhaustion requirement of section 1997e(a) is a jurisdictional prerequisite to suits by a prisoner. Section 1997e(a) provides, "No action shall be brought ... until such remedies as are available are exhausted."

Section 1997e(a) is binding upon this Court, but its provision begs the question of what this Court should do in this particular case. There is simply no evidence that Congress intended by section 1997e(a) to remove every aspect of the district court's traditional equity jurisdiction. The case before me presents complicated factual issues: when the prisoner could reasonably have invoked a grievance procedure, whether such invocation could reasonably have been useful or whether it would have been futile, the degree of relative utility and futility, and the like. In the absence of a developed administrative procedure to deal with suits for "1983" damages that appear from the pleadings to be serious and substantial, dismissal would have been an inappropriate, draconian remedy.

Defendants cite *Weinberger v. Salfi*, 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), in which the Supreme Court held that language in the Social Security Act mandating the use of administrative procedures is jurisdictional. But comparisons to Social Security law and regulations are inapt. Congress mandated an elaborate and comprehensive administrative scheme to adjudicate cases of entitlement and disability under the Social Security laws. Adjudications are on the record and counsel is permitted to participate. *See* 42 U.S.C. § 405. The district court's jurisdiction is to review the record produced by the administrative agency. Section 1983 cases are different, Such cases are tried to a jury under the Civil Rights Law and, as the state's motion for reconsideration makes clear, the state is not willing to apply or adapt its grievance procedures to adjudicate any of the issues raised by plaintiff's complaint of medical indifference causing serious, permanent injuries.

It is for reasons such as this that *Weinberger* is held not to apply to "1983" cases, even those falling under the PLRA, for, unlike Social Security law and regulations, the section 1997e(a) provision for exhaustion lacks the "sweeping and direct language" of the Social Security law and regulations. *Underwood v. Wilson*, 151 F.3d 292, 294 (5th Cir.1998) (citations omitted),

*cert. denied,* —— U.S. ——, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). As the Fifth Circuit held:

> [Weinberger] turned on the fact that cited portions of the statute in question made the administrative decision of the Secretary "binding," set forth limited procedures for judicial review, and denied the existence of any civil cause of action arising under the Social Security Act.
>
> In contrast, § 1997e(a) contains no such sweeping and direct language barring federal question jurisdiction under 28 U.S.C. § 1331. Rather than proscribing a cause of action, the Civil Rights Act specifically creates a civil cause of action.

*Id.* Other courts of appeal have held similarly. *See Rumbles v. Hill,* 182 F.3d 1064, 1067–68 (9th Cir.1999) [1]; *Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532, 535 (7th Cir.1999); *Wright v. Morris,* 111 F.3d 414, 420–21 (6th Cir.1997); *see also Hayes v. N.Y.S. D.O.C. Officers,* 97 Civ. 7383(MBM), 1998 WL 901730, *6 n. 4 (S.D.N.Y. Dec. 28, 1998).[2]

There is no evidence that Congress intended, in amending section 1997e(a), to eliminate the district court's equitable jurisdiction in aid of the Civil Rights Act, 42 U.S.C. § 1983. A prisoner remains entitled to sue for damages when public officials violate his civil rights. The provisions for *sua sponte* dismissal and dismissals for failure to exhaust administrative remedies introduced by the PLRA were intended to reduce the incidence of frivolous lawsuits that threatened to overwhelm the federal courts. *See* PLRA, Pub.L. No. 104–134, 110 Stat. 1321 (1996). That Congress provided for such dismissals in lieu of 180 day continuances while prisoners exhausted "such plain, speedy, and effective administrative remedies as are available" does not mean that Congress intended to eliminate equitable stays where the interest of justice require a stay rather than a dismissal. The state's interpretation of the change in section 1997e(a) provided by the PLRA goes much too far.[3]

Thus, I hold that the requirement of section 1997e(a), that prisoners must exhaust such administrative remedies as are available, is not a prerequisite to this court's exercise of jurisdiction over prisoners' civil rights cases under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. The court

1. Defendants rely on *Saulsbury Orchards and Almond Processing, Inc. v. Yeutter,* 917 F.2d 1190, 1194 (9th Cir.1990), for the proposition that statutory administrative exhaustion requirements are jurisdictional. To the extent that *Saulsbury* declares this as a general rule, it has been overruled, at least with respect to § 1997e exhaustion, by *Rumbles.*

2. Although the Second Circuit has not yet squarely addressed this question, the recent opinion in *Snider v. Melindez,* 199 F.3d 108, 111–112 (2d Cir.1999), describes the failure to exhaust administrative remedies under the PLRA as a "procedural flaw."

3. Defendants' reliance on the concurring opinion in *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 137, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (Brennan, J., concurring), is misplaced. *Fair Assessment* involved a 1983 claim on an allegedly unconstitutional tax assessment, and in interpreting specific jurisdictional language in the Tax Injunction Act, Justice Brennan noted: "In 1937 the requirement of exhaus-

tion of state administrative remedies was certainly a mandatory precondition to suit, and in that sense a 'jurisdictional prerequisite.' " *Id.* This observation on the status of the federal courts' equity jurisdiction over state tax matters in 1937 has no bearing on the issue before us today. Moreover, Justice Brennan, in arguing that the district court's decision to dismiss for failure to exhaust should be upheld, did not purport to address the question of whether a dismissal, instead of a stay, was required.

While it may be true that "every premature filing" of a suit imposes some burden on defendants, *McNeil v. United States,* 508 U.S. 106, 112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), there is no reason to believe that this burden is increased when premature suits are stayed instead of dismissed. At any rate, my task remains to balance the equities in this particular case, and in my previous order I concluded that they militated in favor of a stay.

must evaluate the nature of the administrative remedy that is claimed to be available, in the context of the alleged injury to a prisoner's civil rights, in order to evaluate if a complaint should be dismissed or if, in the exercise of sound judicial discretion, the complaint should be stayed.

## II. Defendants' Argument that all Claims of Plaintiff are Time–Barred is Without Merit. Determining What Claims Plaintiff Should Have Exhausted, What Administrative Remedies Were Reasonably Available to Him, and When Plaintiff Should Have Pursued Them, are Issues for the District Court's Determination

Plaintiff alleges that the injuries he suffered from defendants' indifference to his medical needs were irreducibly fixed when those acts occurred. Nevertheless, defendants argue, the state's grievance procedures could have been invoked afterwards, within 14 days according to the regulations, and even afterwards in the discretion of the Inmate Grievance Program ("IGP") supervisor. *See* N.Y. Comp. Code R. & Regs. tit. 9, § 701.7(a)(1). Defendants argue that plaintiff can be charged with negligence or deliberate neglect for failure to invoke those procedures, and plaintiff is now time-barred by the 14 day period provided by the regulations. It does not matter, according to defendants, that plaintiff was unconscious, or subject to considerable pain, or in the hospital; he could have grieved that which caused these conditions or his hospitalization.

Again, defendants' arguments go too far. The possibility of invoking administrative procedures after constitutional rights have been violated and injury has been suffered cannot fix that which has occurred. That which may be called a "remedy" cannot be a remedy if repair is no longer possible. A violation of constitutional rights is actionable even if only "nominal" damages are available, *see Amato v. City of Saratoga Springs*, 170 F.3d 311 (2d Cir.1999)—much more so where, as here, plaintiff claims to have suffered serious permanent injuries.

That injuries were suffered in the past—even irreducibly suffered—does not mean that they could not have been made better, or that the state's grievance procedures might not have worked to make them better. In that sense, plaintiff may be charged with negligence or deliberate neglect in not invoking administrative procedures that could have ameliorated his injuries and mitigated his damage. As with any defense of mitigation, defendant has the burden to plead and prove that there were available administrative remedies that it was reasonable for plaintiff to have invoked, and that, had plaintiff invoked such remedies, the proximate result would have been an amelioration of his injuries and mitigation of his damage.[4]

These issues—what remedies were available in the context of which injuries, whether such remedies could have ameliorated the injuries that were suffered, when plaintiff should reasonably have invoked any such remedies, and the like—are questions of fact, relevant to the issue of exhaustion that defendants raise as an affirmative defense. They are triable issues,

4. In light of my ruling, I need not decide between cases holding that the inability to invoke administrative remedies because of a time-bar does, or does not, make the administrative remedy "available" for the purpose of determining if a prisoner may proceed with his civil rights action. *Compare Wright v. Morris*, 111 F.3d 414, 417 n. 3 (6th Cir.1997) (holding, in dicta, that a prisoner who was time barred from pursuing administrative remedies was also barred, by the PLRA, from bringing a 1983 suit); *with Mitchell v. Shomig*, 969 F.Supp. 487, 492 (N.D.Ill.1997) (holding that a time-barred administrative remedy is not "available" within the meaning of the PLRA), *and Graves v. DeTella*, 96 Civ. 6540, 1998 WL 196459, *2–*3 (N.D.Ill. April 17, 1998) (same); *see also Hattie v. Hallock*, 16 F.Supp.2d 834, 837 (N.D.Ohio 1998) (expressing unwillingness to adopt the rule suggested in *Wright* as "harsh," and instead denying plaintiff's motion on other grounds).

to be determined like all other relevant issues, in the context of a civil rights case under 42 U.S.C. § 1983.

 Whether the failure to invoke these remedies bars suit under the PLRA, however, presents a different question, one whose answer turns on whether or not the remedies offered by the state were, under the PLRA, "available" to address plaintiff's claims. That question is a legal question, to be answered by the Court. Congress did not define what it meant by "such administrative remedies as may be *available*". In the absence of a definition in the law being interpreted, the Court must "rely upon traditional methods of statutory construction...." *Whitley v. Hunt*, 158 F.3d 882, 886 (5th Cir.1998). In such instances, "[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (Marshall, C. J.).

 I hold, therefore, that a remedy is "available" or not, under the PLRA, depending on the practical purpose that it can reasonably accomplish. If a remedy can accomplish no practical purpose with respect to a particular claim, it is not "available" to. address that claim. *See Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir.1998). This does not mean that the remedy offered need be exactly the remedy the prisoner seeks, or even that the remedy offered need be plain speedy and effective. To be "available," the administrative remedy must serve some purpose with respect to the relief plaintiff seeks. As the Second Circuit has recently held, moreover, it is the duty of the court, and not any administrative agency, to determine whether, and to what extent, and at what period of time, the state's administrative procedures could have served such

a practical purpose. *See Snider*, 199 F.3d at 112–114 ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law.").

### III. *There are No Administrative Remedies Available to Plaintiff, and this Matter May Proceed to Trial*

 As noted at the outset, the New York State Attorney General had previously represented, in answering my interrogatories, that there were available administrative remedies capable of addressing the issues needing adjudication in this case. *See* Def. Ltr. in Response to Court Interrogatories, Dated April 14, 1999. I believe, moreover, that a reasonable interpretation of the New York State Inmate Grievance Program supports the availability of the types of administrative procedures I suggested be accorded plaintiff on remand in my previous order. *See* N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.1— 701.16 (1995). Thus the IGP provides for a formal hearing process if the dispute in question cannot be resolved "informally," *see id.* § 701.7(a)(4), and the procedural rules contemplate that an inmate may have an "advisor" represent him at this hearing. *Id.* § 701.7(a)(4)(iv).[5] The IGP rules further provide that the committee presiding over this hearing shall issue a "written decision, including the reasons therefore [*sic*]...." *Id.* § 701.7(a)(4)(v). Finally, the IGP rules mandate that complete grievance records be kept for three years, and that such records comprise "the original grievance, responses from each level of review, investigations, referenced documentation, and verification of implementation when appropriate." *Id.* § 701.10(b)(1).

---

**5.** While a subsequent rule defines "advisor" as "a staff member or another inmate of [the grievant's] choosing," *id.* § 701.10(a), nothing in this language indicates that this definition is intended to be exclusive, or that legal counsel may not serve as the advisor.

It was against the backdrop of the Attorney General's representations, and the IGP rules, that I directed that plaintiff be given an administrative hearing at which a transcript record would be·made, and at which plaintiff would be permitted to have the assistance of counsel. If such an evidentiary hearing were held, a meaningful administrative investigation of plaintiff's grievance would have been had, and the benefits to both plaintiff and this Court in adjudicating plaintiff's claims would be manifest. By providing for detailed fact-finding and the development of an evidentiary record, administrative procedures can streamline the adjudicative process and materially aid the adjudication required in courts of law. *See Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 539, 142 L.Ed.2d 448 (1998). Indeed, as I noted in my previous opinion, the legislative history of the PLRA indicates that a desire to assist courts in this fashion was one of the motivations behind the act. *See Id.*, at 115. Administrative procedures such as those I have described would provide much practical assistance in the adjudication of plaintiff's claims for money damages, and I thus held that they were an available remedy under the PLRA, and that exhaustion was therefore required.

The procedures I suggested, moreover, are widely available in various administrative contexts under both federal and state law. The detailed procedural protections under the Social Security Act, for example, have already been noted, and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, generally provides that adjudicative hearings conducted by agencies under federal law shall be on the record and allow for the assistance of counsel. New York State similarly provides for such procedures in diverse administrative contexts. Worker's Compensation hearings, for one instance, allow for the assistance of counsel, *see* N.Y. Comp.Codes R. & Regs. tit 12, § 300.17, and a "stenographic record of the proceedings" is made. *Id.* § 300.9. Unemployment insurances hearings, as another example, also allow for counsel and a "verbatim" record.[6] *Id.*, § 461.4.

My remand, then, was predicated on the understanding that similar procedures were available or could easily be made available under the IGP. Remand from the courts is clearly contemplated by the procedural rules of the IGP, which allow the IGP supervisor to toll the 14 day limitations period on grievances for circumstances such as "referrals back to the IGP by the courts." N.Y. Comp.Codes R. & Regs. tit 9, § 701.7(a)(1).˙ Nevertheless, the New York Attorney General now insists that formal hearing procedures involving counsel and a transcript record are not available under the IGP and cannot reasonably be made available. The Attorney General maintained at oral argument that the remedies offered by the IGP Were forward looking and remedial only, in the sense of allowing for the discipline of malfeasant prison staff or the provision of better medical care in the future. *See* Tr. of Oral Arg. dated September 29, 1999, pp.·5–14. None of these limitations were noted in the defendants' original motion to dismiss, or in the letter they sent in response to Court interrogatories on the availability of administrative remedies.

Under these circumstances, I conclude that the administrative remedies offered under the IGP, as limited by the Attorney General, can serve no practical purpose with respect to plaintiffs allegations of completed and irreducible medical injuries.

---

**6.** The Attorney General's argument that my order of July 29, 1999 imposes improper and unconstitutional requirements on the state administrative process is hard to understand. First, I did not require it. It is for the state to decide if it wants to have an administrative fact-finding process. Second, the procedures that I suggested are, as discussed above, normal administrative procedures. In any event, the issue has become academic in light of the Attorney General's representation in its motion for reconsideration that proper fact-finding procedures in relation to completed acts are not available.

They do not provide for monetary relief; they are not intended to be adjudicative in nature; they do not provide for the development of a meaningful administrative record; and they do not allow counsel to participate. Regarding past and irreducible injuries, the IGP procedures are an empty formality, and as such are not an "available" administrative remedy under the PLRA. Remand to the IGP at this point can serve no useful purpose, and this matter may thus proceed to discovery and trial.

## IV. *Conclusions*

For the foregoing reasons, I conclude that there are no administrative remedies "available" for exhaustion, and that plaintiff's case may proceed to discovery and trial. If plaintiff failed to exhaust administrative remedies and that failure exacerbated the damages plaintiff claims to have suffered, or rendered the amelioration thereof impossible, defendants may raise that issue as an affirmative defense, and evidence may be taken with respect to that issue. In light of defendants' report that there are no further remedies for plaintiff to exhaust, the stay of proceedings provided by my Order of July 28, 1999 is dissolved, and the parties may proceed in this Court in the ordinary course.

Pursuant to Federal Rule of Civil Procedure 16, the parties are directed to appear before the Court for a case management conference on January 19, 2000, at 4:30 pm to regulate further proceedings in this matter.

SO ORDERED.